Joseph S. MARRANCA, Plaintiff,

v.

UNITED STATES, Defendant.

Charles MARRANCA, Plaintiff,

v.

UNITED STATES, Defendant.

Civ. Nos. 83–0619, 0620.

United States District Court,
M.D. Pennsylvania,
Scranton Division.

Feb. 29, 1984.

Patrick E. Dougherty, Kingston, Pa., for plaintiffs.

Frederick E. Martin, Asst. U.S. Atty., Lewisburg, Pa., Michael J. Salem, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## OPINION AND ORDER

CONABOY, District Judge.

These are consolidated actions brought pursuant to the Internal Revenue Code of 1954, Section 7429 (26 U.S.C.), in which the Plaintiffs seek judicial review of termination assessments made against them by the Internal Revenue Service for Federal Income Tax liabilities from January 1, 1983 to and including February 23, 1983.

Jurisdiction for this proceeding is found in the Internal Revenue Code of 1954, Section 7429 (26 U.S.C.) which was added to the Code by Section 1204(a) of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520. Section 7429 provides for a judicial review of the Commissioner's action, in the case of a jeopardy or termination assessment, and the issues before the court under such a review are two-fold: (1) the reasonableness of making the assessment; and (2) the appropriateness of the amounts assessed.

Because we find the taxpayers have shown that the amounts assessed were not appropriate under the circumstances, we will remand this matter to the Commissioner for reassessment of the amounts due from each of the taxpayers.

I

The Internal Revenue Code contains provisions for the special assessment of taxes when circumstances exist which would make doubtful the collection of certain tax liabilities. There are two separate types of these special assessments: one, a "jeopardy assessment" under Sections 6861 and 6862 of the Code, and the other, a special "termination assessment" under Section 6851 of the Code. The distinction between the two types is that a "jeopardy assessment" under Section 6861, or 6862 is made for a tax year that has ended and for which the due date of filing a return has passed, while a "termination assessment" under Section 6851 is made for a tax year that either has not ended or for which the due date for filing a tax return has not yet passed. In the instant case, we are dealing with a "termination assessment" under Section 6851 since the assessment against Plaintiffs, whose tax year ended on December 31, 1983, was made on March 7, 1983, for the period January 1, 1983 through February 23, 1983.

The authority for, and procedures necessary to the making of termination assessments of income tax, as set out in 26 U.S.C.A. § 6851 are as follows:

(a) Authority for making.

(1) In general. If the Secretary finds that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein or to do any other act ... tending to prejudice or to render wholly or partially ineffectual proceedings to collect the income tax for the current or the immediately preceding taxable year unless such proceeding be brought without delay, the Secretary

shall immediately make a determination of tax for the current taxable year or for the preceding taxable year ... and notwithstanding any other provision of law, such tax shall become immediately due and payable. The Secretary shall immediately assess the amount of the tax so determined ... and shall cause notice of such determination and assessment to be given the taxpayer, together with a demand for immediate payment of such tax.

Under normal tax assessment procedures, there is generally a considerable lapse of time between the first notice of tax deficiency, and the actual enforced collection of the tax. The taxpayer who wishes to contest a proposed assessment has various administrative remedies and, if no agreement is reached, he may petition the Tax Court, all of this, without the actual collection of the tax claimed. However, when the IRS determines that the collection of tax may be in jeopardy, it may forego usual procedures and immediately assess and collect the tax claimed.

Prior to the enactment of the Tax Reform Act of 1976, P.L. 94–455, no immediate avenue for judicial review of jeopardy assessments was available to taxpayers: (4 U.S.Cong. & Adm.News 1976, 2897, 3789, at p. 3790).

> The taxpayer who has been subjected to a jeopardy assessment ... does not have all the protection afforded the ordinary taxpayer during the judicial review. In the normal deficiency case, the Service is prohibited from making an assessment and taking collection action against a taxpayer's property prior to the time allowed for filing a petition for redetermination and during the time litigation is pending in the Tax Court. Although the Service is generally precluded from selling any property seized prior to or during Tax Court litigation, the jeopardy taxpayer—unlike the ordinary taxpayer—loses the use of whatever property has been seized by the Service while relief is sought in the Tax Court.

Section 7429 of 26 U.S.C.A., enacted as a part of the Tax Reform Act of 1976, being Title XII, § 1204(a) of Public Law 94–455, 90 Stat. 1695, provides for both administrative and judicial review of jeopardy tax assessments, including termination assessments under Section 6851 of the Code. The procedures available are as follows:

1. Within five (5) days after a jeopardy assessment is made, under § 6851, the Secretary must provide the taxpayer with a written statement of the information upon which he relied in making the assessment;

2. Within thirty (30) days after the statement is furnished, the taxpayer may request the Secretary to review the action taken;

3. Upon such request, the Secretary must determine "whether or not" making the assessment was "reasonable under the circumstances," and whether the amount of the assessment was appropriate under the circumstances.

After this administrative review, the taxpayer is entitled to bring an action under § 7429 for the purpose of obtaining a limited judicial review of the administrative taxing procedures. Under § 7429(b)(2) the district court is limited to a determination of whether or not

(A) the making of the assessment under section 6851, 6861 or 6862, as the case may be, is reasonable under the circumstances, and

(B) the amount so assessed or demanded as a result of the action taken under section 6851, 6861, or 6862, is appropriate under the circumstances.

If it is determined that the assessment or its amount was unreasonable, the court may order the assessment abated, remand the matter for redetermination of the amount assessed, or take such other action as may be appropriate. § 7429(b)(3). Any determination by a district court under § 7429 is final and conclusive, and is not subject to review by any other court. § 7429(f).

■ In determining whether or not the making of an assessment is "reasonable under the circumstances," the burden of proof upon this issue is upon the IRS. In determining whether or not the amount of the assessment is "appropriate under the circumstances," the burden of proof is upon the taxpayer, although the Secretary must provide a written statement which contains a description of the information he used in arriving at the assessment.

■ It is clear from the legislative history of the Act that the District Court is to make a *de novo* determination in considering the reasonableness of the assessment and the appropriateness of the amount assessed. *See Loretto v. United States* (E.D. Pa.1977) 440 F.Supp. 1168 at p. 1171. What is reasonable under the circumstances means "something more than 'not arbitrary or capricious,' and something less than 'supported by substantial evidence.'" *Ibid.* at p. 1172.

In the instant case the Internal Revenue Service made termination assessments against the Plaintiffs on March 7, 1984 for income taxes for the period January 1, 1983 through and including February 23, 1983, in the amount of $54,577.94 for each of the taxpayers. After these termination assessments were made the Plaintiffs sought administrative review of the assessments with the Internal Revenue Service. The assessments were sustained by the Appellate Division on May 5, 1984 and thereafter, on May 11, 1983, this action was timely filed in this Court.

July 6, 1983 was set as the date for hearing in this matter, however, at the time of the scheduled hearing the Court was requested to meet with, and did in fact, have a lengthy meeting and discussion with counsel for all parties. Among other things, counsel indicated to the Court that there were distinct possibilities that an amicable resolution of the problem could be reached, and to that end counsel for all parties met for an extended period of time and made a good-faith effort to arrive at just such a solution. For a variety of reasons, such a "settlement" could not be reached on that date.

When the Court was informed that the "status quo" would be maintained regarding all property of the Plaintiffs, which might eventually be subject to assessment or attachment pending the outcome of this case, the Court agreed to a continuance of the matter to allow counsel for all parties to continue to explore the possibility of an amicable settlement of the tax claims herein.

Additionally, at the hearing on July 6, 1983, counsel discussed with the Court the concept of submitting all of the issues involved to the Court by way of affidavits and briefs which would encompass all of the legal issues involved as well as any factual presentations which either side wished to make.

Under those circumstances, the Court entered an Order granting a continuance and directing counsel to submit to the Court all affidavits, supporting documents and briefs on or before July 25, 1983.

Counsel have complied with the Court's Order on the submission of documents. However, the Court was importuned on several occasions following the date of July 25, 1983 to continue to hold this case open so that continued efforts could be made regarding the claims against both Plaintiffs.

By letter of counsel for the government we have now been informed that the Internal Revenue Service has finally decided that it will not accept the offers of settlement submitted by the Plaintiffs, and that the matter should proceed to Court resolution of the issues here presented.

## II

The factual background in this matter is not in serious dispute, at least for the purposes for which this matter is before this Court. Nor do Plaintiffs make much argument concerning the reasonableness of the termination assessments made by the Internal Revenue Service. What is strongly contested by the Plaintiffs is the appropri-

ateness of the amounts of the assessments made against them. Following here, then, are the facts presented to the Court on this issue.

Commencing on January 30, 1983 legal wiretaps were placed by the Pennsylvania State Police on the residential telephones of Joseph Marranca at 107 Jean Street, Exeter, Pennsylvania, and the residential telephone of his brother Charles Marrance at 106 Jean Street, Exeter, Pennsylvania. These wiretaps revealed that the taxpayers were involved in accepting "layoff" bets on various sporting events (particularly football and basketball games), and further revealed the extent of the betting activity for the particular days on which the wiretaps were monitored. Based upon information received from the wiretaps and additional surveillance, search warrants were issued for the premises of the taxpayers and executed on February 23, 1983.

During the course of the searches, the State Police, in conjunction with various local police, seized the following matter from the residence of Charles Marranca.

1. Sixteen yellow legal size sheets of paper with betting notations thereon;

2. Assorted sports schedules;

3. Sixteen *gold sheet* football and basketball sheets with betting notations thereon;

4. One paper marked "KENO" with betting notations thereon;

5. Two papers with assorted phone numbers;

6. One small yellow paper with betting notations thereon;

7. One football betting slip dated January 9, 1983;

8. One phone bill for telephone number 655–3270;

9. Two yellow papers with sports bets thereon;

10. Other items having connection, more or less with sports betting operations.

From Joseph Marranca's residence the following was obtained:

1. Two bank bags containing $38,050.00 in paper currency;

2. Sixteen yellow sheets with betting notations thereon;

3. One brown metal box containing four money bags (one bag containing $10,-000.00 in currency; another containing $10,000.00 and 8 silver dollars);

4. One packet of money in the amount of $320.00;

5. Other items having connection, more or less with sports betting operations.

All of the foregoing materials were seized by the State Police and are presently held by said police at the Dunmore Barracks, Dunmore, Pennsylvania.[1]

Based on its assessment and analysis of the wiretap and search and seizure information obtained by the State Police, the Internal Revenue Service concluded that the taxpayers were operating as "bankers" in an illegal wagering operation for a period beginning at least in 1982 and ending at the time of the State Police raids on February 23, 1983. "Bankers" in such an operation are the people who control the illegal wagering operations. They make all payouts, pay commissions owed to betting pool sellers, and are literally the owners-operators of the betting business. Based upon the aforesaid information, the Service determined that average daily receipts of $11,400.00 were taken over the telephone of Charles Marranca and average daily receipts of $3,497.00 were taken over the telephone of Joseph Marranca. These average daily receipts were then combined and multiplied by 53 days to determine a gross income from gambling for the two Plaintiffs of $789,852.00. The Internal Revenue Service then utilized a factor of

---

1. At the time of the search and seizure the taxpayers argued that the $58,000.00 in cash seized was to be used as a payroll for the company, the Carmen Dress Company, Inc., a matter of no concern regarding the issues before this Court.

30% as a profit margin for the illegal wagering operation, resulting in an estimated net profit of $236,956.00. This amount was then split equally between the Plaintiffs, again based on the wiretap information which indicated that the Plaintiffs were in the habit of splitting the profits from the enterprise equally.

Based upon this information the Service then made termination assessments against the Plaintiffs on March 7, 1983 for income taxes for the period January 1, 1983 through and including February 23, 1983 in the amount of $54,577.94 for each of the taxpayers.

In making the determination to grant termination assessments, the Service determined that such an early termination was necessary because there was little if any property of the taxpayers that could be available for seizure and sale for such large tax debts.

The real estate of the taxpayers was held in tenancy by the entireties with their respective wives, and the Carmen Dress Company, Inc., owned substantially by the taxpayers, appeared to generate little income which could be looked to the payment of taxes stemming from the taxpayers' gambling activities. Indeed, in addition to the assets seized by the Pennsylvania State Police, the only locatable assets of the taxpayers were their automobiles, which were apparently seized by the Service on the same day that the termination assessment was made.

### III

As we pointed out above, our review here is not plenary and our action under Section 7429 will indeed have no effect on the determination of the correct tax liability in any subsequent proceedings appropriately before the tax court. Here we are to determine only (1) whether or not the making of the assessment was reasonable under the circumstances; and (2) whether or not the amount so assessed is appropriate under the circumstances. And, because this is a summary proceeding, rather than a full evidentiary hearing, this Court need

not determine whether the information obtained by the Service, and relied upon in making the assessment against the Plaintiffs is in a form which would permit its admission into evidence in a trial on the merits of the entire case. The focus of Section 7429 then, is whether the Service's actions were reasonable and appropriate under the circumstances in which they acted. *See Canon v. United States,* 40 A.F.T. R.2d 5529 (Nev.1977); *Haskin v. United States,* 444 F.Supp. 299 (C.D.Cal.1977).

As indicated above, the taxpayers here really make no serious argument against the reasonableness of the Service's action in making the assessment, and in our review of the circumstances within the framework of the law as we have outlined it, we also find that the Service's action in making the termination was reasonable and find that the Service has sustained its burden of proof in that regard.

### IV

The real problem in this case in its present posture is the second issue before the Court, namely, the appropriateness of the amount of the assessment.

In our Order of July 5, 1983 we approved counsel's suggestion of submitting this matter on affidavits and supporting documents, as well as briefs. Following that Order, the Government submitted its brief and expanded thoroughly and fully on its argument, however, it submitted no affidavits or any other documents to support its position. Contrary to that, the taxpayers submitted with their briefs a number of documents bearing specifically on the issue of the appropriateness of the Service's attachment of a 30% profit margin to the amounts calculated to have been taken in in the gambling operation of the taxpayers. The additional submissions of the taxpayers include:

1. An affidavit of an attorney who reviewed all of the wiretap conversations secured from the taps placed on the residence of the taxpayers and concluded that "the alleged gambling

operations pertained to sports betting and specifically, there was no mention of lottery operations or wagering."

2. An excerpt of testimony of a Commonwealth witness, Peter A. Tonetti, a member of the Pennsylvania State Police, at the preliminary hearing on the state gambling charges against the taxpayers, in which said witness indicates that the profit margin in an operation such as the taxpayers were engaged, would approximate 5% to 10%.

3. An affidavit of a former member of the Federal Bureau of Investigation, Theodore Cole Whitcomb, who specialized in technical gambling investigations throughout the country, and who also opined that the "normal gross profits from sports wagering is always at 5% or below."

4. A submission from the Gaming Control Board of the State of Nevada indicating that profits in sports pools betting in a period from March 31, 1978 to December 31, 1982, averaged no higher than approximately 7%.

In trying to determine the basis for the Service's assessment of a 30% profit margin, we reviewed what has been made part of the pleadings in this case by its attachment to the Complaint, namely, the Revenue Agent's explanatory notes which were submitted to the Commissioner. In those notes, under a section called "Explanation of Items", the Agent explains "net profit from wagering was determined to be 30% of gross receipts by application of the Tax Court decision in *Shades Ridge Holding Company, Inc. v. Commissioner*, 123 C.C.H.—Ct.Memo 1964—275." This is the singular and only item on the record before this Court from which we can determine the method by which the Service arrived at its 30% profit margin figure.

While the Government has not reviewed the *Shades Ridge Holding Company* case in its brief, the taxpayers have done so and we have thoroughly reviewed that case in our effort to reach an appropriate determination. We find that case to be an inappropriate basis on which the Service would reach such a judgment however, since the case involved the operation of a lottery, which is a much different gambling operation than the type involved here, namely, a sports wagering type of operation. What the *Shades* case does for the Service, is to give it a basis upon which it calculated the total amount of business that the taxpayers allegedly did during the termination assessment period. The Tax Court held that it was appropriate to arrive at an approximate amount of business that was done in a single day and then to multiply that number by the number of days for which period the assessment is made. We find no reason to conclude that the Service in this case was wrong in determining the total amount of business done by the Marrancas for the 53 day period in which they allegedly carried on this illegal gambling operation. In *Shades* however, the Court had before it substantial testimony from experienced police officials, indicating that a lottery operator usually made a profit of 50% of the gross receipts, less commissions, which had to be paid on that income. It was appropriate therefore in that case to reach a 30% profit figure after deducting appropriate expenses. The Commissioner in reaching his profit estimation in this case had no such information before him however, and while we realize that the Commissioner had no adequate records of the taxpayers upon which he could base his determination, we are also faced with the legal authority which says that the lack of such records does not give the Commissioner carte blanche for imposing "draconian absolutes". *See Webb v. Commissioner of Internal Revenue*, 394 F.2d 366 (5th Cir. 1968), and *Gerardo v. Commissioner of Internal Revenue*, 552 F.2d 549 (3d Cir. 1977).

In considering the burden of proof on the respective parties in this case, then, we have a situation where the taxpayers have submitted to this Court substantial evidence that the profit margin from the gambling activity in which they were involved

is substantially less than that ascribed to it by the Commissioner in his assessment determination. While there is some difference among the various courts which have considered similar cases about whether or not under such circumstances the burden shifts to the Government to substantiate its assessment, we need not determine whether there is a shifting of such a burden in this instance, for what we have here has been described as a "naked" assessment without any foundation whatsoever, and such an assessment is simply not appropriate under any circumstances. *See U.S. v. Janis,* 428 U.S. 433, 440–441, 96 S.Ct. 3021, 3025–3026, 49 L.Ed.2d 1046.

As pointed out in *Janis,* there appears to be some debate among the Federal Courts of Appeals, in different factual context, as to the effect upon the burden of proof in a tax case where there is positive evidence that an assessment is incorrect. Some Courts indicate that the burden of showing the amount of the deficiency then shifts to the Commissioner. Others hold that the burden of showing the correct amount of tax remains with the taxpayer. The Court points out however, that that debate does not extend to the situation where the assessment is shown to be naked and without any foundation. In such a case the assessment of the Commissioner simply cannot be found to be appropriate and the taxpayer must be found to have sustained his burden of showing that the assessment cannot stand.

### V

We find, then, in this case that the action of the Commissioner in making the assessment here was reasonable, but we find further, that the taxpayers have sustained their burden of showing that the amount of the assessment is not appropriate under the facts presented to this Court. Because we feel that the Commissioner should be given the opportunity to review the appropriate evidence concerning the type of profit margin that generally attaches to a sports gambling operation such as that carried by the Marrancas, it is our conclusion

that the appropriate action here is to remand this matter to the Commissioner for further review of the amount of the assessments in these cases consistent with our discussion herein.