**Richard W. BEAN**

v.

**UNITED STATES of America.**

**Civil Nos. C–85–2869, C–85–2872.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 8, 1985.

Stephen C. Whicker, Esq. W. Blake McCarty, Esq. Somers & Altenbach, Atlanta, Ga., for plaintiff.

Larry D. Thompson, U.S. Atty., Barbara V. Tinsley, Asst. U.S. Atty., Atlanta, Ga., Philip R. West, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

## ORDER

**ORINDA D. EVANS, District Judge.**

On May 6, 1985, Plaintiff Richard W. Bean filed a complaint to determine the reasonableness and appropriateness of two jeopardy assessments levied against him by the Internal Revenue Service. Jurisdiction of the court was invoked pursuant to 26 U.S.C. § 7429(b).[1] This action is now before the court on the Government's motion for summary determination. For the reasons hereafter stated, the court concludes that both the making of the jeopardy assessments and the amount so assessed were "reasonable under the circumstances." 26 U.S.C. § 7429(b)(2).

■■■■ As a threshold matter, the court notes that summary disposition, without an evidentiary hearing, is permissible in cases challenging jeopardy assessments, as long as there is no genuine factual dispute for resolution at trial. *Canon v. United States*, 40 A.F.T.R.2d 5529, 5531 (D.Nev. 1977); *McAvoy v. Internal Revenue Service*, 475 F.Supp. 297 (W.D.Mich.1979). The Supreme Court, in *Commissioner v. Shapiro*, 424 U.S. 614, 633, 96 S.Ct. 1062, 1073, 47 L.Ed.2d 278 (1976), held that the United States may rely solely on affidavits to establish the reasonableness of a jeopardy assessment. Although *Shapiro* was decided prior to the enactment of 26 U.S.C. § 7429, nothing in the language of that section or its legislative history is inconsistent with the procedures endorsed in *Shapiro*. To the contrary, Congress intended § 7429 to provide for "expedited" judicial review of jeopardy assessments. U.S.Code Cong. & Admin.News (1976) 4118, 4189. Accordingly, the district court need not consider the taxpayer's ultimate liability for the underlying tax or penalties. S.Rep. No. 938, 94th Cong., 2d Sess. at 365, U.S. Code Cong. & Admin.News 1976, pp. 2897, 3439. *McAvoy, supra* at 298; *Bremson v. United States*, 459 F.Supp. 121 (W.D.Mo. 1978); *Haskin v. United States*, 444 F.Supp. 299, 304 (C.D.Cal.1977); *Loretto v. United States*, 440 F.Supp. 1168, 1175 (E.D.Pa.1977). And, the court may consider any information which the government relied upon in making the jeopardy assessment against the plaintiff, without regard to whether such evidence would be admissible in a trial on the merits. *Bremson, supra; Billig v. United States*, 49 A.F.T. R.2d 479, 480–81 (N.D.Ga.1981); *McAvoy, supra* at 299; *Marranca v. United States*, 587 F.Supp. 663 (E.D.Pa.1984). In short, this court may grant summary determination based solely on the government's affidavits if there is no dispute as to any fact material to the reasonableness of the assessment at issue. *See Randall v. United States*, 49 A.F.T.R.2d 1042 (D.Minn.1982); *Ericksen v. United States*, 45 A.F.T.R.2d 1053 (E.D.Mich.1980).

In support of its motion, the Government has submitted affidavits of Susan Knoff and Sheretta Jones, the IRS agents who investigated Bean and recommended making the jeopardy assessments at issue. Bean, by way of response and opposition, has submitted portions of the deposition of Mr. Thom Coulter, a securities investigator

---

1. § 7429. Review of jeopardy assessment procedures

   (b) *Judicial review.*—
   (1) *Actions permitted.*—Within 30 days after the earlier of—
   (A) the day the Secretary notifies the taxpayer of his determination described in subsection (a)(3), or
   (B) the 16th day after the request described in subsection (a)(2) was made,
   the taxpayer may bring a civil action against the United States in a district court of the United States for a determination under this subsection.
   (2) *Determination by district court.*—Within 20 days after an action is commenced under paragraph (1), the district court shall determine whether or not—
   (A) the making of the assessment under section 6851, 6861, or 6862, as the case may be, is reasonable under the circumstances, and
   (B) the amount so assessed or demanded as a result of the action taken under section 6851, 6861, or 6862, is appropriate under the circumstances.
   If the court determines that proper service was not made on the United States within 5 days after the date of the commencement of the action, the running of the 20-day period set forth in the proceding sentence shall not begin before the day on which proper service was made on the United States.

for the State of Georgia. Bean's version of the facts is not supported by affidavit, however. According to Bean's counsel, Bean is currently incommunicado "somewhere in Central America" and, because of the "unstable political climate" in that region, could not be contacted to file an affidavit in this matter.

Fed.R.Civ.P. 56(e), to which this proceeding is analogous, requires a party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Normally, these facts must be supported by affidavit, and the court would be reluctant to rule against a party who had failed to submit a supporting affidavit due solely to physical incapability. However, in this case, the court finds that even if the facts which Bean contends are in dispute were supported by affidavit, those facts would still not be material to a resolution of this case.

Therefore, based on the deposition of Thom Coulter and the affidavits of agents Knoff and Jones, the following facts are before the court. In approximately March, 1985, Knoff began an examination of Bean's alleged promotion of abusive tax shelters, and of Bean's income tax liabilities for the years 1981, 1982 and 1983. Knoff found that Bean was indeed selling abusive tax shelters, and that Bean's individual tax returns contained overstated deductions and understated gross income. Knoff concluded that Bean's outstanding income taxes and penalties owing extended to over $350,000, including the penalties assessed under 26 U.S.C. § 6700 for abusive tax shelters.

During her examination, Knoff found Bean to be uncooperative in providing the IRS with the documentation necessary to conduct a thorough examination. Moreover, Bean withheld "information returns" (Form 1099s), which he had illegally failed to file with the IRS. The examination

problems encountered as a result of Bean's non-cooperation and failure to file the required information returns were compounded by the fact that Bean uses the names of and operates through the several business entities which he controls.[2]

Knoff's investigation revealed that Bean began promoting the sale of gemstone mining tax shelters in 1981. These tax shelters were sold in the form of limited partnership interests. The partnership leases mine sites in Brazil from a Cayman Islands corporation, and contracts with a Brazilian corporation to do the mining. Payments to these companies are made largely by the use of non-recourse notes, on which no payments have been made to date. Although no payments are made on the notes, current tax deductions are taken for expenses they evidence. The Government claims that these deductions follow a classic abusive tax shelter pattern, and are in violation of the Internal Revenue Code.

Knoff has identified three separate partnerships which Bean formed in 1981, and which operate in the above-described manner. These partnerships are Tulagi Mine Ltd., Tulagi Mine II, Ltd., and Deep Pockets Mine. Knoff discovered a total of 38 partners in those entities, who have invested over $300,000. The Government claims that these mining tax shelters are presumptively abusive, for three reasons. First, IRS personnel spent three weeks looking for mines in the area of Brazil where the mines are supposedly located, and could not find Bean's Brazilian mining sites. Second, the use of non-recourse financing, as described above, violates the "at-risk" rules of the Internal Revenue Code. Third, Bean has not provided the IRS with the permit required by Brazilian law for the extraction of minerals from Brazilian soil.

Knoff further found that in 1982, Bean expanded his tax shelter activity. Knoff

---

**2.** Business entities controlled by Bean include: Cheyenne Development Corporation, International Financial Advisors, Inc., International Financial Services, Frontier Development Corporation, New West Horizons Homeshare Partnerships, Western Frontier Development Corporation Homeshare, Precious Gems Unlimited, Deep Pockets Mine, Tulagi Mine, Ltd., Tulagi Mine II, Ltd., Pepiot Mine, Ltd., Queen Charlotte Mine, Suzanne Mine, Ltd., and Aurora Amethyst Mine.

describes two examples of abusive tax shelters promoted by Bean. The first involved using the "Rule of 78's" to amortize interest payments on a condominium. According to promotional materials for this shelter, each condominium is purchased by at least six investors. Each investor makes an initial investment of approximately $5,000, followed by payments of $2,221 per annum for ten years. Investors are then promised $212,486 in total income tax deductions. The Government claims that, despite the IRS's publication of several rulings disallowing the "Rule of 78's" as a method of amortizing interest, promoters continue to sell this classic abusive tax shelter.

The second example of Bean's promotional activity, cited by Knoff, involved the donation of historic facades. Condominium investors received a pass-through of tax credits for historic rehabilitation expenditures, and charitable contribution deductions for donating their interests in the facades. Knoff claims that the partial documentation which she has obtained on this shelter reveals an invalid method of computing tax benefits, based on an inflated facade value instead of cost, and that investors in this type of shelter are normally entitled to a minimal deduction and credit, if any.

Based on the above information regarding Bean's sale of abusive tax shelters in 1981 and 1982, Knoff concluded that Bean was subject to penalties under 26 U.S.C. § 6700. Knoff set the amount of the penalty at $89,000. This figure represents the number of partnership interests sold by Bean to investors (89), multiplied by the statutory penalty of $1,000 per instance of penalty conduct.

In addition to Bean's promotions of abusive tax shelters, Knoff investigated Bean's income tax returns for the years 1981, 1982 and 1983. Knoff determined that Bean had claimed $9,291 in non-allowable charitable deductions for the years 1981 and 1982. Bean also claimed $220,778 in non-allowable deductions for solo proprietorship business activities in 1981, 1982 and 1983. During these same years, Bean also claimed non-allowable partnership losses totaling $170,861, which were deducted from his taxable income. Knoff further determined that, over this 3-year period, Bean underreported his gross income in the amount of $54,544; that $1,049 in non-allowable interest expense deductions were taken in 1982; that $118,121 in unsubstantiated corporate loss deductions were taken in 1983; that an unwarranted $5,100 deduction for contribution to a "Keogh Plan" was taken in 1981; and that other tax and penalty computation adjustments for the years 1981, 1982 and 1983 totaled $48,571. Knoff concluded that Bean owes the United States approximately $350,000. The IRS provided Bean with letters to this effect, containing itemized annual breakdowns of Knoff's calculations, on February 19, 1985 and April 15, 1985.

Knoff further claims that on February 12, 1985, she learned from "reliable sources" that on February 11, 1985 Bean had been arrested for misrepresenting, through his attorney, to the Superior Court of DeKalb County, Georgia, that he was on an extended trip in Europe. According to Knoff and agent Jones, on February 8, 1985, the same date that Bean's attorney claimed that Bean was in Europe, Bean had personally appeared at the Georgetown, Georgia branch of the Trust Company Bank and had withdrawn $168,000. At about the same time in February, 1985, Bean had directed personnel at the C & S National Bank to transfer all funds in his account to an account controlled by him in a Panamanian bank. Jones and Knoff also learned that at the time Bean was arrested, he was carrying a cashier's check for $90,-000, drawn on the C & S National Bank. Agent Jones further learned, from official land records, that in December, 1984, Bean had sold his home for $340,000. Knoff subsequently discovered that Bean had departed the country, leaving no forwarding address, although his attorney requested that all correspondence be sent to his (the attorney's) office. Finally, Agent Jones claims that she learned from other IRS personnel that Bean had traveled to South

America in the recent past, and concluded from this information that he had a valid passport in his possession. On February 13, 1985, agents Jones and Knoff met with the Chief of the Atlanta District Quality Review Staff and District Counsel attorneys to discuss these facts, and the possibility of jeopardy assessment action. Authorization was obtained from the District Director to make jeopardy assessments pursuant to 26 U.S.C. §§ 6861 and 6862.

In support of its motion for summary determination, the Government claims that the totality of the above facts indicate that Bean intended to quickly depart from the United States, and to place his property beyond the reach of the government by liquidating his assets and transferring them offshore. The Government argues that these facts support the IRS' decision to make jeopardy assessments for income taxes under 26 U.S.C. § 6861, and for tax shelter penalties under 26 U.S.C. § 6862, as these sections allow the IRS to bypass normal assessment and collection procedures whenever collection of revenue is "in jeopardy." Bean counters that the Government has not met its burden of proof with respect to the reasonableness of the jeopardy assessment, as Knoff's and Jones' affidavits cannot support the IRS' determination to proceed with the jeopardy assessments. Bean further challenges the appropriateness of the penalties assessed under 26 U.S.C. § 6700, and argues that the IRS' determination of the promoter penalty is erroneous as a matter of law.

Section 7429(b), set out in note 1, *supra,* provides for a two-pronged judicial review of jeopardy assessments. Under § 7429(b)(2), the district court shall determine whether the making of the assessment is reasonable under the circumstances, and whether the amount assessed is appropriate under the circumstances. If the court determines that the assessment is unreasonable, or the amount inappropriate, the court may order abatement, redetermination of the assessment, or other such action as the court deems appropriate. § 7429(b)(3). On the issue of the reason-ableness of the assessment, the IRS has the burden of proof. The court may consider not only information available to the IRS at the time of the assessment, but also any relevant information gathered after that date. *Fidelity Equipment Leasing Corp. v. United States,* 462 F.Supp. 845, 849 (N.D.Ga.1978). The taxpayer has the burden as to the appropriateness of the amount assessed, but the Secretary must provide a written statement which contains the information on which the determination of the amount was based. *Lovana Farms, Inc. v. United States,* Slip.Op. at 18, (Civil No. C85–22–G, N.D.Ga. March 12, 1985).

The language of § 7429(b) gives the courts little guidance in determining the "reasonableness" of an assessment. 26 U.S.C. § 6861(a) provides that a jeopardy assessment may be levied by the IRS if it believes that the collection of a deficiency will be "jeopardized by delay." Prior to the enactment of § 7429, the IRS issued a set of standards to be used in determining whether the circumstances of a particular case warranted the use of a jeopardy assessment. In considering the enactment of § 7429, Congress specifically approved these standards. Joint Committee on Taxation, General Explanation of Tax Reform Act of 1976, H.R. 10612, 94th Cong.2d Sess. 356 n. 1, 361 n. 7 (1976). These standards state that jeopardy assessment is appropriate where:

(1) The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself:

(2) The taxpayer is or appears to be designing quickly to place his property beyond the reach of the Government either by removing it from the United States, or by concealing it, or by transferring it to other persons, or by dissipating it; or

(3) The taxpayer's financial solvency appears to be imperiled.

If any one of these conditions is found to exist, the Government's use of jeopardy assessment procedures is warranted. However, the court is in no way limited to a consideration of only these factors in

**658**

determining the reasonableness of the Government's action. *Fidelity Equipment, supra* at 849. Finally, although Congress did not define "reasonable under the circumstances," courts reviewing this language have determined that it "means something more than not arbitrary and capricious, and something less than supported by substantial evidence." *Lovana Farms, surpa* at 18, *citing Loretto v. United States,* 440 F.Supp. 1168 (E.D.Pa. 1977).

In addition to the alternative standards listed above, courts have considered a variety of factors in determining the reasonableness of a jeopardy assessment. Such factors include evidence that the taxpayer travels abroad frequently, *Conforte v. United States,* 45 A.F.T.R.2d 575, 576 (D.Nev.1980); *Bremson, supra* at 126; that the taxpayer is leaving or may be expected to leave the country, *Id.* at 126; *Conforte, supra* at 576; that the taxpayer has recently conveyed real estate, *Bremson, supra* at 126, or discussed such conveyance, *Conforte, supra* at 576; that the taxpayer controls bank accounts containing liquid funds, *Bremson, supra;* that the taxpayer has not supplied public agencies with appropriate forms or documents when requested to do so, *Conforte, supra* at 576; *Haskin v. United States, supra* at 302–304; *Billig v. United States, supra* at 88,-635; that the taxpayer controls numerous business entities, *Haskin, supra* at 302–304; that the taxpayer attempts to make sizable bank account withdrawals at the time of the assessment, *Id.* at 303; that the taxpayer maintains foreign bank accounts, *Id.; Conforte, supra* at 576; that the taxpayer takes large amounts of money offshore, *United States v. Vicknair,* 452 F.Supp. 470, 471 (S.D.Fla.1978), *app. dismissed,* 617 F.2d 1129 (5th Cir.1980); that the taxpayer has many business entities which can be used to hide his assets, *Zion Coptic Church, Inc. v. United States,* 79–1 U.S.T.C. ¶ 9325 (S.D.Fla.1979); *Felkel v. United States,* 83–1 U.S.T.C. (CCH) ¶ 9426 (D.S.C. June 3, 1983).

■ The court finds that each of these factors is present in this case. The evidence before the court indicates that the Government reasonably could have believed that Bean was planning to depart the United States, and to place his property beyond the Government's reach by liquidating it and removing it from the United States. Bean had sold his house, and left the country with no forwarding address after withdrawing large sums of cash. Bean was involved in the promotion and sale of abusive tax shelters, a fact which supports the conclusion that Bean is "capable of, and willing to, avoid taxes by any method." *Lovana Farms, surpa* at 30. Whether Bean in fact intended to depart the country, liquidate his assets and thereby avoid payment of his taxes is irrelevant. The court thus concludes that the Government has met its burden of showing that its issuance of the jeopardy assessments in question was reasonable under the circumstances.

■ Under the second prong of § 7429(b), once the court determines that an assessment is reasonable, it must decide whether the amount assessed is appropriate. *Revis v. United States,* 558 F.Supp. 1071, 1079 (D.R.I.1983). The taxpayer bears the burden of proving that the amount assessed is not appropriate. 26 U.S.C. § 7429(g)(2). As the amount assessed is presumed appropriate, courts have held that estimates and extrapolations are reasonable means of determining assessments, especially when the taxpayer does not provide much information regarding his personal finances. *Felkel, supra* at 87, 247; *Revis, supra* at 1080; *Danneman v. United States,* 84–2 U.S.T.C. (CCH) ¶ 9792 (D.Md. July 9, 1984). However, a court may find that the amount assessed is inappropriate if the taxpayer presents evidence that the IRS has not been diligent and thorough, *Pennek v. United States,* 84–2 U.S.T.C. (CCH) ¶ 9911 (S.D.Fla. Jan. 25, 1984), or that the IRS has based its assessment on "suspect methodology" or "indirect methods," *Northeast Chemical, Inc. v. IRS,* 81–2 U.S.T.C. (CCH) ¶ 9611 (W.D.Ky.1981).

Here, the Government has submitted an Explanation of Adjustments for the tax year ending 1981, and one for tax years ending 1982 and 1983, detailing the bases for adjustments to Bean's income tax returns. These adjustments total approximately $261,000. Bean has raised no objection to the appropriateness of these amounts. However, the Government has submitted a third Explanation of Items, detailing the computations underlying the § 6700 penalty for the promotion of abusive tax shelters. Bean has strenuously objected to the appropriateness of this § 6700 penalty, arguing that the Government's interpretation and application of the statutory language is incorrect as a matter of law, and that the § 6700 penalty assessed against him should be $7,375 rather than $89,000.[3]

26 U.S.C. § 6700(a) provides for a penalty to be assessed against any person who organizes, or sells an interest in, a partnership or investment plan, and who makes a false or fraudulent statement with respect to the securing of any tax benefit in connection with such organization or sale. § 6700 provides that this penalty shall equal "the greater of $1,000 or 10% of the gross income derived or to be derived from such activity." The Government construes the word "activity" to refer to each instance of fraud or false statement. Thus, every time Bean attracted a new limited partner to a tax shelter, he violated § 6700. Knoff determined that there were 89 investors in Bean's shelters; accordingly, she assessed Bean $89,000 in penalties.[4] Bean, however, argues that the word "activity" refers to each partnership which he promoted, rather than to each sale of a partnership interest in which he participated.

Bean therefore concludes that the penalty assessed against him should be the less of $4,000 (4 partnership activities × $1,000) or $7,375 (10% of $73,375 gross income derived from partnership activities).[5]

The court is not persuaded by Bean's interpretation of the statute. First, the court notes that the amount assessed by the Government should be presumed appropriate. *See* S.Rep. No. 94–938, 94th Cong., 2d Sess., 365, U.S.Code Cong. & Admin.News 1976, p. 3795. Second, another court which recently addressed this question concluded that the term "activity" refers to each individual sale, where a false or fraudulent statement was made in connection with that sale. *McGrew v. United States*, No. 85–0513–Civ-Orl, (M.D.Fla. July 31, 1985). Therefore, the court finds that the amount assessed by the government was appropriate. The court notes that this decision is not a determination of the merits of Bean's ultimate tax liability, and will have no effect on the determination of his actual tax liability in any subsequent proceeding. *Revis, supra* at 1074, *citing* S.Rep. No. 94–938, *supra* at 365, U.S.Code Cong. & Admin.News 1976, p. 3795.

Accordingly, the Government's motion for summary determination is GRANTED.

---

**3.** Due to a typographical error, the amount of $87,000 instead of $89,000 appears on the face of the IRS' February 19, 1985 letter to Bean. The correct figure appears on the Explanation of Items attached to that letter.

**4.** Knoff's calculations were as follows:

| Name of Promotion | No. of Investors × | $1000 per activity |
| --- | --- | --- |
| Queen Charlotte Mine | 35 | $35,000 |
| Suzanne Mine | 13 | 13,000 |
| Pepiot Mine | 16 | 16,000 |
| Aurora Amethyst Mine | 25 | 25,000 |
| Total Penalty | 89 | $89,000 |

**5.** Bean arrives at the $7,375 penalty as follows:

| Promotion Activity | Gross Income |
| --- | --- |
| Queen Charlotte Mine | $26,250 |
| Suzanne Mine | 10,000 |
| Pepiot Mine | 18,750 |
| Aurora Amethyst Mine | 28,750 |
| | $73,750 × 10% = $7,375 |