**GEORGE F. HARDING MUSEUM, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 86 C 2003.**

United States District Court, N.D. Illinois, E.D.

Dec. 4, 1987.

Roger J. McFadden, Jeffrey B. Lieberman, Schuyler, Roche & Zwirner, Chicago, Ill., for plaintiff.

M. Ellen Carpenter, Tax Div., U.S. Dept. of Justice, Washington, D.C., Joseph Duffy, Acting U.S. Atty., James P. White, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

The Internal Revenue Service terminated plaintiff's status as a tax-exempt private foundation, as defined in the Internal Revenue Code, 26 U.S.C. § 501(c)(3), while simultaneously placing upon it a $30,000,000 jeopardy assessment. Section 507(a)(2) directs the IRS to terminate a private foundation's § 501(c)(3) status for wilful, repeated or flagrant acts giving rise to tax liability under chapter 42 of the Code, 26 U.S.C. § 4940 *et seq.* Plaintiff George F. Harding Museum (the Museum) moves here for an order to abate the jeopardy assessment. Pursuant to § 7429 of the Code, the court determines whether, under the circumstances, the making of the assessment is reasonable and the amount so assessed is appropriate.[1] After a thorough review of the record, we hold that the jeopardy assessment is unreasonable and order its abatement.

## BACKGROUND

Disposition of the Museum's property has spawned several litigations, including an action by the State of Illinois in the Circuit Court of Cook County, deficiency claims by the IRS against four separate individuals and the Museum in the United States Tax Courts, an action against the United States in Claims Court alleging wrongful termination of the Museum's § 501(c)(3) status, as well as three separate proceedings in the United States District Court, including one consolidated proceeding to determine whether any tax claims are subordinate. That property consists of objects in the Museum's collection (the Collection) currently in the possession of the Art Institute of Chicago, as well as the Museum's liquid assets currently held under the supervision of Judge Albert Green of Cook County Circuit Court.

Fifty years ago the Collection was housed in a replica of a European castle situated behind the mansion of its founder, George F. Harding, in Hyde Park, Chicago. Harding was an avid collector of historical objects consisting primarily of medieval arms and armor suits, as well as various art relics. In 1930 Harding established his collection (reportedly worth $5,000,000 at that time) as a not-for-profit tax-exempt corporation. In his will Harding directed that his collection be maintained and operated as a museum, and he left his entire fortune (approximately $4,000,000) in a trust, with the necessary powers to achieve this objective. The Collection was kept on display from Harding's death until January 1965, when it was crated and moved to a building owned by the Museum on the corner of Randolph Street and Michigan Avenue.

Since 1976 the State of Illinois, as plaintiff, and the Museum and its officers, as defendants, have been locked in protracted state court litigation.[2] In that suit the state alleges misuse and abuse of trust through self-dealing of the Museum's property. In December 1981 Judge Green entered an agreed order placing the Muse-

---

1. Under the Code this court does not review the termination of the Museum's status—the subject matter for a case pending before the United States Claims Court, *George F. Harding Museum v. United States*, No. 224–86–T. Nor is this court the final arbiter of the Museum's tax liability—the subject matter before the United States Tax Court in *George F. Harding Museum v. Comm.*, No. 17541–86.

2. The lawsuit, *People of the State of Illinois, ex rel. William J. Scott v. Silverstein*, 76 CH 6446, names the Museum, the president of the Museum, Herman Silverstein, and Museum officers B.L. Tockman, Virginia Cline and others as party defendants.

um's liquid assets under the administration of a court appointee.[3] On May 3, 1982, the Museum agreed to transfer its net assets to the Art Institute, and on May 21, 1982, Judge Green allowed the transfer of the Collection, which remains on display at the Art Institute. Paragraph 3 of that agreement provides that the plaintiff shall transfer

such cash and other liquid or non-collection assets of the Harding Museum as the Circuit Court of Cook County designates by order to be free of claims of creditors and current and accrued accounts payable (including attorney fees, costs and disbursements presently or hereafter submitted to the Court) ... to the Art Institute to be held as a special fund ("The George F. Harding Fund"), the income and principal of which shall be devoted to the conservation of, acquisition for and/or exhibition of the provision of special gallery space for and scholarship on the George F. Harding Collection.

Around this time, or perhaps earlier, the IRS got wind of the possible wrongdoing of the Museum's officers and began investigating potential federal tax liabilities. Notice of deficiencies based upon alleged acts of self-dealing and making taxable expenditures during the years 1975 and 1977 through 1983 were delivered against the Museum's officers and are currently the subject of cases pending before the Tax Court.[4] IRS officials did not terminate the Museum's § 501(c)(3) status at that time, nor did it attempt to intervene in the state court proceedings.[5] The government continued its investigation into plaintiff's tax

liabilities and obtained a copy of the original complaint filed in the state court action. Further inquiry was hampered, however, due to a protective order by Judge Green restricting any disclosure and because of the IRS officials' sensitivity to the state's role in the litigation.[6]

In November 1983, and again in April 1984, the IRS served a summons on Michael Ficaro, attorney for the state, to obtain further documents, but Judge Green refused to lift the protective order. The government then brought enforcement proceedings in the United States District Court. On December 3, 1985, Judge Bua ordered enforcement of the summons and set December 16 as the date for the state to begin producing documents. Between the time of that court order and the time set for production of documents, Ficaro and others met with the IRS and discussed further details of their litigation against the Museum, as well as the terms of a pending settlement.

Specifically, the IRS learned from Ficaro that in 1967 Silverstein had used $250,000 of the Museum's money to acquire stock in the Mid–America National Bank of Chicago, and that Silverstein, Virginia Cline, Edythe Sloane (B.L. Tockman's sister) and David Kent Cline (Virginia's brother) were all receiving salaries from that bank. The IRS further learned that the Museum was paying rent on a Michigan Avenue office which was being used by Silverstein as a law office, arguably in violation of chapter 42 of the Internal Revenue Code. The government therefore terminated the Mu-

---

**3.** While the Museum claimed the value of the fund on its 1983 and 1984 Form 990–PF, a note on those forms explains to the IRS that the funds are ultimately controlled by the orders of Judge Green.

**4.** *Herman Silverstein v. Comm.,* Nos. 2288–83, 3134–84, 3512–84, 3156–85, 3107–86 and 6912–86; *B.L. Tockman v. Comm.,* Nos. 2299–83, 3131–84, 3443–84, 3096–85, 3133–86, 6913–86; *Virginia Cline v. Comm.,* Nos. 2301–83, 35506–83, 3444–84, 3097–85 and 3108–86; and *David Kent Cline v. Comm.,* No. 3127–86.

**5.** IRS officials testify that they considered intervention inappropriate since, at that time, the

government did not have an assessment against any of the parties to the state court action, such assessment being a statutory requirement for intervention. These officials further testify that they did not recommend the termination of the Museum's status because they were concerned about the impact of such action on the state court proceedings.

**6.** Senior IRS attorney Virginia Crosley states that IRS officials believed that under the statutory provisions Congress had made it clear that the state has primary responsibility for regulating private foundations.

seum's status as a § 501(c)(3) organization and imposed the jeopardy assessment.

## 26 U.S.C. § 6861

Jeopardy assessments pursuant to § 6861 are extraordinary measures which bypass the established preassessment procedures the government uses to collect its revenues. Section 6861 is usually employed to prevent persons operating outside the law from laundering or concealing large amounts of cash in order to escape their tax liabilities. Section 4584.2 of the Internal Revenue Manual states:

(1) All jeopardy assessments have the common characteristic that prior to assessment it is determined that collection will be endangered if regular assessment and collection procedures are followed. ... In determining whether a jeopardy assessment will be made, at least one of the following conditions ... must exist. The conditions are:

(a) the taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself/herself;

(b) the taxpayer is or appears to be designing quickly to place his/her or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons;

(c) the taxpayer's financial solvency is or appears to be imperiled. (This does not include cases where the taxpayer becomes insolvent by virtue of the accrual of the proposed assessment of tax, penalty and interest.)

(2) Jeopardy assessments should be used sparingly and care should be taken to avoid excessive and unreasonable assessments....

(3) All examiners should be alert for conditions ... where a jeopardy assessment may be necessary to protect the government's interest. Areas where a jeopardy condition may arise include, but are not limited to the following:

(a) Narcotic Cases

(b) Cases involving Taxpayers engaged in organized crime ...

(c) Wagering Cases ...

(d) Strike Force Cases ...

(e) Cases involving taxpayers who are reasonably believed to be receiving income from an illegal activity....

(f) Cases involving taxpayers known or suspected of having plans for leaving the United States without making provisions for payment of their taxes (i.e., aliens generally considered as border hoppers).

(g) Cases were [sic] an individual in physical possession of cash, or its equivalent, in excess of $10,000 and does not claim such cash as his/her's, or as belonging to another person whose identity the Secretary can readily ascertain and who acknowledges ownership of such cash, then the collection of tax on such cash is presumed to be in jeopardy within the meaning of code section 6867.

Congress, in enacting § 7429, approved the guidelines now contained in the Internal Revenue Manual, § 4584.2. *See Strauser v. United States,* 535 F.Supp. 957, 960 (N.D.Ill.1982).

Section 7429 contemplates *de novo* review by this court of jeopardy assignments and we give the IRS administrative determination of reasonableness no deference whatsoever. *See, e.g., Strauser,* 535 F.Supp. at 958; *Barry v. United States,* 534 F.Supp. 304, 308 (E.D.Pa.1982); *Loretto v. United States,* 440 F.Supp. 1168, 1172 (E.D.Pa.1977). Judicial review in this context has been analogized to a preliminary examination for probable cause in a criminal proceeding. *See United States v. Doyle,* 482 F.Supp. 1227, 1229 (E.D.Wis. 1980). Under the statute the burden of proof for showing that the assessment was reasonable rests with the IRS, while the burden of showing that the amount assessed is inappropriate lies with plaintiff. Section 7429(g)(1) and (2). If the court determines that the assessment is unreasonable or inappropriate, it may order the government to abate, redetermine or "take such other action as the court finds appropriate." Section 7429(b)(3). Any determi-

nation made shall be final and unreviewable. Section 7429(f).

## DISCUSSION

█ This case does not fit comfortably within the expectable confines of §§ 6861 and 7429. It does not relate to narcotics, organized crime, a criminal enterprise or aliens about to flee across the border. The great bulk of the assets, the Collection, was transferred to the Art Institute in 1982 and is on display to the public. The IRS does not contend—at least not seriously—that it can recover any tax liability from those assets. Its interest is in liquid assets of approximately $3,500,000 which have not yet been disbursed and remain subject to disposition pursuant to order of Judge Green. The unique circumstances have led to a number of unique contentions, but this court is left with an abiding conviction that the jeopardy assessment accords with neither the language nor the purposes of the statutory scheme.

Much of the IRS argument, and much of the rebuttal, centers upon the IRS contention that it reasonably believed that settlement of the state court action was imminent when the jeopardy assessment was imposed in January 1986, and that, therefore, it was justified in moving swiftly to prevent the possible disbursement of the remaining assets. While plaintiff argues that such a settlement, even if it went forward, would come to fruition only after extensive further proceedings before the state court, we believe that the IRS did then reasonably believe that Judge Green would move expeditiously to conclude an old and contentious litigation on a reasonable basis if he could do so. But that is irrelevant, or largely so, to the issue here.

The terms of the state court settlement—as explained to IRS officials—included payment of approximately $1,000,000 in attorneys' fees for past services to the Museum and/or officers and directors of the Museum in the state court action, the transfer of the net assets to the Art Institute, and the transfer of the remaining personal assets belonging to Silverstein and Tockman to the Art Institute upon their deaths. In the notice provided to the Museum, the IRS stated the following bases for the jeopardy assessment against the Museum:

> 1) The liquid assets of the Museum are being eroded by the continued payment of salaries and other expenses to its officers/directors.
> 2) Attorneys defending the officers/directors in the pending case in Circuit Court are seeking over one million dollars in fees from the Museum.
> 3) The State of Illinois is seeking settlement of their case and possession of the liquid assets of the Museum.

(IRS Form 886–A, Explanation of Items, Def.Supp.Mem. at 21.)

Certainly the Museum is not designing to depart from the United States, nor is it trying to place its property beyond the reach of the government by removing it from the United States or by concealing it. Further, while the government questions the Museum's financial status, the tax liabilities are its sole risk to solvency since its assets will be transferred to the Art Institute only after all outstanding liabilities (except possibly taxes) have been paid.

Payment of salaries and expenses by the Museum will cease upon settlement. Clearly, then, an imminent settlement cannot cause the IRS apprehension that assets which should be used to pay taxes will *thereafter* be diverted if a settlement is approved. The State of Illinois has made it clear that its interest is to see that the assets go to the Art Institute. The sole remaining issue is whether or not the IRS has reasonably determined that "the taxpayer is or appears to be designing quickly to place his/her or its property beyond the reach of the Government ... by dissipating it, or by transferring it to other persons." Internal Revenue Manual, § 4584.2(1)(b).

There are two possible routes of dissipation: one to the Art Institute after payment of expenses, and the other to the attorneys in the state court proceedings. We do not believe that the 1982 agreement to transfer the net assets to the Art Institute provides a reasonable basis for a jeopardy assessment. First, it should be noted

that the taxpayer cannot do anything unilaterally. Whatever the view of the Museum, the liquid assets are held by a court-appointed representative and are subject to court order. Once the net assets are transferred to the Art Institute it is that institution which has control. We recognize that some courts have upheld termination assessments in cases where large amounts of currency have been seized and secured by the government and were subject to possible forfeiture. *Gonzalez v. United States,* 606 F.Supp. 134 (S.D.Fla.1985); *Loretto v. United States,* 440 F.Supp. 1168 (E.D.Pa. 1977). Those cases, however, involved narcotics dealing and the courts noted that the taxpayers either were likely to regain control over the money or were concealing other assets which could be the subject of tax liabilities. Here the Museum will not regain control over the assets and cannot conceal any others. They can only be placed, arguably, beyond the reach of the IRS if the Illinois Attorney General agrees to a settlement and Judge Green gives his approval. That is not, this court believes, the kind of taxpayer control which the Congress contemplated in authorizing jeopardy assessments, an action to be "used sparingly."

Further, we do not believe that the transfer of funds to the Art Institute under the 1982 agreement provides the real motive for the IRS action. The 1982 agreement provided for the transfer of net remaining assets to the Art Institute to service the Collection. That agreement establishes an advisory committee to oversee the expenditure of those funds after transfer to the Art Institute, that committee consisting of three of the officers and directors charged with breach of trust, a respected attorney who has represented them in the state court litigation, and four representatives of the Art Institute.[7] From that the IRS argues that the Museum continues and will continue to control even the assets going to the Art Institute because four of the eight

committee members come from the Museum. But the committee's role is advisory only and, besides, one does not assume that an attorney will, because of prior representation, breach his trust. Even if the Art Institute, for reasons which do not appear to this court, should feel obligated to respect an impasse on the committee despite the fact that a failure to act may constitute a breach of trust, state law provides traditional means of resolving questions arising from such an impasse. While the IRS indicates that abatement would follow an appropriate transfer to the Art Institute, that is of interest only in defining what this dispute is, and is not, all about. The real rub is the attorneys' fees. The incidents of transfer to the Art Institute are relevant only to whether the net assets remain within the reach of § 6861.

■ The IRS could be acting on the belief that either the payment of attorneys' fees is legitimate, but dissipates the liquid assets, or is illegitimate. Let us assume, for the moment, that the IRS agreed that the attorneys were entitled to be paid by the Museum for prior services. We do not believe that payment to the attorneys in those circumstances and subsequent disbursement of the net funds to the Art Institute are dissipations or transfers justifying a jeopardy assessment. Whenever the IRS determines that a taxpayer may owe additional taxes, that taxpayer's current assets may well be "dissipated" to meet current expenses and "transferred" to others who are actual, as distinguished from potential, creditors. The taxpayer may well, in those not uncommon circumstances, be less able to respond to a subsequently determined tax liability, but that, certainly, is not the extraordinary situation Congress had in mind. The IRS is here, after all, only a potential creditor. Whether taxes are due is the issue before the Tax Court. The jeopardy assessment becomes a mechanism for disabling those who have (the Art Institute) or may have (the attorneys) existing rights, from realizing upon

---

**7.** From that the Museum argues that this court should abate any tax to the extent it falls upon assets transferred to the Art Institute as an established charity, since the IRS could and probably would do so, and this court acts *de novo.*

But the issue here is abatement of a jeopardy assessment, not the exercise of an administrative discretion under § 507(g) which has yet to be invoked.

them until the IRS can perfect a potential right before the Tax Court.[8] Clearly, however, a jeopardy assessment is not reasonable if its purpose is to gain time to perfect a priority over other claimants. The statute contemplates the movement of property out of the reach of the government by means of underhanded maneuvering of funds into shell corporations or by the laundering of cash drawn from illicit activity. The payment of attorney fees, especially in the context of Judge Green's supervision, is expenditure in the ordinary course of business and cannot reasonably be understood as the type of dissipation for which the extraordinary measure of the jeopardy assessment was intended.

Perhaps, then, at bottom is the IRS concern that Museum assets otherwise available for payment of taxes may be paid to attorneys for services to officers or trustees in defending against wilful breaches of trust, which breaches, the IRS insists, in fact occurred. This court assumes that a charity's indemnification of trustees for wilful breach of trust is a dissipation of assets, that payment of the trustee's attorneys in those circumstances is such an indemnification and that such a payment is subject to an excise tax for self-dealing and is not exempted by 26 U.S.C. § 4941. If that were likely to occur then, arguably, the IRS could reasonably conclude that assets were being improperly dissipated and that the dissipation itself was a taxable event.

■ But is that likely to occur? The state court action was brought by the Illinois Attorney General pursuant to his responsibility to police charitable trusts. That action cannot be settled without his concurrence. It cannot be settled without the approval of Judge Green. Federal law recognizes that the primary responsibility for policing charitable trusts lies with the states. *See Gladney v. C.I.R.*, 745 F.2d 955, 961–962 (5th Cir.1984). Indeed, the tax abatement permitted by 26 U.S.C. § 507(g) rests, in part, upon a state certification that corrective action has been tak-

en. *See also* n. 6 *infra.* Illinois trust law prohibits indemnification of a trustee for a wilful breach of trust. *See generally* G. Bogert, *The Law of Trusts and Trustees,* § 871, n. 83 (2d Ed. 1962); *Craven v. Craven,* 407 Ill. 252, 95 N.E.2d 489 (1950); *Ellis v. King,* 336 Ill.App. 298, 83 N.E.2d 367 (1949).

This court well recognizes that the vindication of that principle does not necessarily require the litigation of every claim of wilful breach to final judgment. The reasonableness of a settlement has to be viewed in light of several factors, such as likelihood of success, the likelihood of collection and the expense of litigation. The ultimate responsibility is to do what is in the best interests of the trust and its beneficiaries, in this instance the people of Illinois. Section 507(g) implicitly recognizes, in its use of the term "corrective action," that vindication of the public interest may fall short of a total and perhaps Pyrrhic victory. This court cannot conclude that the Illinois Attorney General and the Circuit Court of Cook County will permit an improper dissipation of Museum assets not in the best interests of the trust and in its beneficiaries, and yet, in reality, that is what the IRS is urging this court to conclude.

The IRS was largely frozen out of the state court case. Hindsight indicates that the exclusion may have had the unfortunate result of compelling the IRS to pursue its own version of the public interest. A jeopardy assessment is not, however, appropriate as a means of forcing upon the State of Illinois that version as the only acceptable resolution of a long controversy. This court recognizes that the IRS cannot intervene in the state action as a matter of right. Other mechanisms exist, however, by which its concerns can be manifested. A jeopardy assessment is not one of them. It is abated.

---

**8.** Priority exists from the date of assessment, although collection requires a determination by the Tax Court of any tax due. Priority issues were before Judge Decker and are now before Judge Will, and this court understands the IRS to be concerned that it will not have a reasonable basis for claiming priority unless it can sustain a jeopardy assessment here.