**S.E. FELKEL, Petitioner,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. No. 83–970–15.**

United States District Court,
D. South Carolina,
Florence Division.

June 3, 1983.

Gary Crawford, Florence, S.C., for petitioner.

Mark Meudeking, Tax Div., Dept. of Justice, Washington, D.C., Henry D. McMaster, U.S. Atty. D.S.C., Columbia, S.C., for defendant.

HAMILTON, District Judge.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

This Court, having considered the facts and evidence produced at the hearing of this matter, the briefs and submissions of the parties, the arguments of counsel, and being otherwise fully advised in the premises, hereby enters the following Findings of Facts and Conclusions of Law.

## FINDINGS OF FACT

1. After review of the recommendation for jeopardy assessments made by Revenue Agent Diana Acuff and approval at the intermediate levels of authority, the District Director of Internal Revenue personally approved the making of the jeopardy assessments against petitioner on February 4, 1983.

2. On February 4, 1983, jeopardy assessments of income taxes for the years 1974, 1975, 1976, 1977, 1978, 1979, 1980 and 1981 in the total amount of $4,366,812.58 were made against petitioner, St. Elmo Felkel.

3. By letter mailed by certified mail on February 4, 1983, petitioner was given notice of the jeopardy assessments made against him and was provided with the written statement and computations required by Internal Revenue Code Section 7429(a)(1). The letter also informed the petitioner of his rights to administrative and judicial review of the jeopardy assessments.

4. On February 28, 1983, the petitioner requested an administrative review by the Internal Revenue Service of the jeopardy assessments made against him.

5. After a complete administrative review, the Commissioner of Internal Revenue (hereinafter the "Commissioner") determined that the making of the jeopardy assessments was reasonable under the circumstances and that the amounts of the assessments were appropriate under the circumstances.

6. Thereafter, the petitioner timely filed a Petition for Review of Jeopardy Assessment in this Court on April 21, 1983.

7. The petitioner over the past several years has established some 75 to 100 different, closely held corporations dealing in mortgages and real estate development.

8. With a very few exceptions, none of the corporations referred to in paragraph 7, above, have issued any stock, kept books of accounts, records or corporate minutes, and only eight of the corporations have filed federal income tax returns.[1] An inadequate records notice was sent to petitioner on October 27, 1972. Most (48) of these corporations have forfeited their charters for failure to pay the annual state franchise tax, including "corporations" with current real property holdings.

9. These corporations are, and have been, petitioner's nominee owners of hundreds of parcels of real property with a conservatively estimated value of well over two million dollars, as indicated by county tax assessors appraisals.

10. The petitioner has admitted that he considers all business transactions entered into by these corporations as his own personal business transactions. These corporations are admittedly (by petitioner) alter egos of the petitioner.

11. The petitioner has transferred his real property and assets between these several corporations without any apparent business purpose and without complying with customary business or legal formalities. In this manner of operation, the petitioner has sold hundreds of parcels of real property to third parties during the period 1974–1981, inclusive, realizing an estimated several million dollars in gain.

12. Despite the foregoing, the petitioner has reported only nominal amounts of income over the past decade. The petitioner's tax returns for the years 1974–1981 reflect that he has reported income,[2] adjusted gross income and tax liability for those years as follows:

| Year | Net Business Income | Adjusted Gross Income | Tax Liability |
|---|---|---|---|
| 1974 | 2,961.65 | 2,961.65 | 233.97 |
| 1975 | 18,973.15 | 18,973.15 | 1,342.81 |

---

1. After the making of these jeopardy assessments, the petitioner submitted several federal corporate income tax returns in support of his position. These returns were apparently hastily prepared and on their faces reflect a lack of thoughtfulness and due care in preparation.

2. The source of the income reported by the petitioner on his returns was listed as "fees" presumably from his stated occupation as an "engineer," and a small amount of rental income.

| Year | Net Business Income | Adjusted Gross Income | Tax Liability |
|------|-------------|----------------|---------------|
| 1976 | 9,897.42 | 9,897.42 | 781.90 |
| 1977 | 15,000.00 | 15,000.00 | 2,559.00 |
| 1978 | 15,000.00 | 15,000.00 | 3,233.00 |
| 1979 | 12,000.00 | 12,000.00 | 2,104.50 |
| 1980 | 12,000.00 | 12,000.00 | 2,104.50 |
| 1981 | 15,000.00 | 15,000.00 | 3,121.00 |
| TOTALS: | $100,832.22 | $100,832.22 | $15,369.68 |

13. The petitioner holds all of his assets, business and personal, in the names of these alter ego corporations. The petitioner's home, automobile and all other distrainable assets are held by these alter ego corporations. The petitioner has placed all of his assets beyond the reach of the United States for the collection of its taxes.

14. The petitioner, through the use of his alter ego corporations, has habitually avoided creditors including the United States. In addition to the taxes assessed pursuant to the jeopardy procedures, the taxpayer is presently indebted to the United States for other taxes (1968–1981) in excess of ninety-five thousand dollars, including several thousand dollars for which the United States presently holds judgments. These taxes have heretofore been found to be uncollectible because of the petitioner's use of alter ego corporations and the petitioner's ability to quickly transfer large numbers of his parcels of real property between those corporations.

15. Though the petitioner's business operations are complex, he does not keep any records with respect to the dealings of these alter ego corporations. The Commissioner summonsed all of the petitioner's personal records and the books and records of most of the petitioner's numerous alter ego corporations. However, after judicial enforcement of those summonses, the petitioner was able to produce only a few scraps of paper which were not in the nature of corporate books and records. The records produced show conclusively that the petitioner failed to keep any records from which the Commissioner could determine the petitioner's correct tax liability, starting with the

basis for much of the property which petitioner and his corporations have sold. The petitioner was informed by the Internal Revenue Service in writing on October 27, 1972 that this failure to keep adequate records was in violation of the Internal Revenue Code. However, the petitioner continued to do business without keeping adequate records.

16. Despite the fact that the petitioner's alter ego corporation sold several hundred parcels of real property during the years 1974–1981, the Commissioner has been unable to trace or find the amounts realized from those sales. These amounts have apparently disappeared. The petitioner does not have any substantial permanent bank accounts in the geographical area of his business dealings.[3] The petitioner deals primarily in cash and in cashier's checks. This is inconsistent with standard and prudent business practices and is presumably done to avoid any tracing of assets flowing from the petitioner's corporations to the petitioner.

17. The petitioner signed several Statements of Financial Condition and Other Information (Internal Revenue Forms 433–AB) at the request of revenue officers attempting to collect federal taxes other than those at issue in this action. The petitioner signed these statements under the penalties of perjury. Nevertheless, the petitioner failed to disclose ownership of any property whatsoever; the petitioner did not admit owning any of his 75 to 100 corporations. Though the petitioner had transferred millions of dollars worth of real property (including his own home) to these various corporations, the financial statements completed by the petitioner showed that he was a pauper with no assets and no income whatsoever. The petitioner stated that he was living on money borrowed from his brother on a monthly basis. Given the size of the petitioner's real estate holdings (albeit in wholly-owned alter ego corporations), it is inconceivable that these Statements of Fi-

---

3. The Commissioner issued summonses to every bank in the three-county area where the petitioner operates as a real estate developer.

Only one account was found, and it had only a small amount of money ($2,700.00) in it.

nancial Condition signed under the penalties of perjury were anything less than an attempt to conceal assets from the Commissioner.

18. The petitioner has also used means other than alter ego corporations to avoid and frustrate the collection of federal taxes. After the audit which led to these jeopardy assessments had begun, the petitioner, through one of his alter ego corporations, Yelson Land Corporation, was awarded a large parcel of real property pursuant to an adjudication of a dispute in state court. At the petitioner's request, the parcel was divided into three roughly equal parts. Deeds to the first two parcels went to "Jeffgar Corporation" and "Garwell Corporation" on April 4, 1981. These "corporations" were formally incorporated by the petitioner on June 10, 1982, over one year after the petitioner had these parcels of land transferred to them. The third parcel of land was deeded to "Lawrence O. Stoney and Lawrence O. Stoney as Trustee." The deed did not reflect for whom Mr. Stoney held title as trustee.

Revenue Officer Ben Smith met with Mr. Stoney after locating this property. Mr. Stoney told Revenue Officer Smith that no trust instrument existed and that the property was being held in trust for the petitioner, St. Elmo Felkel, pursuant to a "gentleman's agreement." At the time these parcels were transferred to these nominees, there were Notices of Federal Tax Liens on file. Thus, had this property been transferred to the petitioner, the true owner thereof, these federal tax liens would have been known to have attached to this property and the Commissioner would have more easily been able to foreclose these liens on this property to satisfy the petitioner's outstanding tax liabilities.

19. With respect to the amounts of the jeopardy assessments made against the petitioner, the revenue agent who made the computation, Ms. Diana Acuff, spent over 500 hours reconstructing the petitioner's business dealings for the years 1974, 1975, 1976, 1977, 1978, 1979, 1980 and 1981. Revenue Agent Acuff began by researching courthouse records of land transactions in Charleston, Berkley and Dorchester Counties; the three counties around the petitioner's residence and general place of business. The grantee index in each county was researched to find all property transferred to the petitioner or his corporations. The grantor index was then researched from 1970 forward to identify all sales of property during the audit period as well as all transfers between the petitioner's corporations during this period.

20. From such records some 22 flow charts were developed showing sales of property during the audit years and transfers back and forth between the petitioner's alter ego corporations during these years. These flow charts showed well over five hundred land sales by the petitioner through his alter ego corporations during the years in issue. The flow charts also showed numerous transfers back and forth between the alter ego corporations with no apparent business purpose. The petitioner admitted to Revenue Officer Smith that this was done to avoid lien creditors.

21. Using these flow charts and the sales prices listed on the numerous deeds, Revenue Agent Acuff reconstructed the petitioner's business transactions for the audit years. Income so reconstructed was attributed to the petitioner on the alter ego theory—a theory which the petitioner now admits to be correct.

22. In some cases the petitioner was not allowed any basis in property sold. In these cases it was not possible to determine whether the petitioner had any basis in the property sold. Generally, this was due either to the fact that property was subdivided into smaller parcels or lots without any record of the total number of lots so created, making an allocation of basis impossible, or to the fact that Revenue Agent Acuff was unable to determine whether the petitioner's basis had been recovered in sales occurring prior to 1970. In any event, the information made available to the Commissioner, either through requests during audit, administrative summonses or contained in public records, is wholly insufficient to

establish the petitioner's basis in the majority of the parcels of property sold during the years in issue. This is not to say that the petitioner had no basis in the property sold, but rather that the petitioner's books and records fail to establish a basis with the requisite degree of certainty.

### CONCLUSIONS OF LAW

■ This Court's review of these jeopardy assessments is a limited one. There are only two issues for decision:

1. Whether the making of the jeopardy assessments under Section 6861 of the Internal Revenue Code of 1954 (hereinafter the "Code") was reasonable under the circumstances.

2. Whether the amounts assessed and now demanded pursuant to the assessments are appropriate under the circumstances.

■ The standard which the Court is to apply is a test of reasonableness.

"Reasonableness under the circumstances" means something more than "not arbitrary or capricious," and something less than "supported by substantial evidence." See S.Rep. 94–938, 94th Cong., 2d Sess. 365 (1976), U.S.Code Cong. & Admin.News 1976, p. 2897; *Serpa v. United States,* 81–1 U.S. T.C., para. 9323 (Neb.1981); *Barry v. United States,* 82–1 U.S.T.C. para. 9224 (E.D.Pa. 1982); *McAvoy v. Internal Revenue Service,* 475 F.Supp. 297, 299 (W.D.Mich.1979); *Loretto v. United States,* 440 F.Supp. 1168, 1172 (E.D.Pa.1977). Such a test of "reasonableness under the circumstances" would apply to both the making of the assessments and the appropriateness of the amounts of the assessments.

### A. MAKING OF THE ASSESSMENTS.

■ With respect to whether the making of the assessment was reasonable under the circumstances, other courts have considered several factors which support a determination that jeopardy exists. In this case the Government's proof has established the existence of no less than ten such factors which support a determination that jeopardy exists in this case.

#### 1. *No assets in petitioner's name.*

In this case, revenue officers of the Internal Revenue Service were unable to locate any assets in the petitioner's name. Indeed, the petitioner's own admissions show that he has put his home and automobile in the names of nominee corporations. The petitioner further admits that he has put his substantial real estate holdings in the names of alter ego corporations. Pursuant to the jeopardy assessments in this case, the Commissioner has filed Notices of Federal Tax Liens with respect to this property held by these alter ego corporations. Though the Commissioner has not seized this property, these liens prevent the petitioner from transferring these assets without the release of these liens by the Commissioner. As the court stated in *Loretto, Jr. v. United States, supra* at 1172:

> I conclude that a precautionary termination assessment is reasonable where, as in this case, the record discloses no assets, other than the funds being held in custodia legis, that the IRS could use to satisfy the taxpayer's liability (footnote omitted).

In this case, the same logic applies. Common sense suggests that a delay in making these assessments and filing Notices of Federal Tax Liens would allow the petitioner to carry on business as usual; selling millions of dollars worth of remaining land through numerous alter ego corporations while dissipating amounts received from those sales.

#### 2. *Use of alter ego corporations.*

The petitioner, by his own admission, used some 75 to 100 different closely-held corporations in the course of his real estate business. However, the Commissioner was only able to locate about 75 of these corporations. The petitioner admits that these corporations were alter egos and that, in truth, he was personally doing business through their facade. The use of so many corporations serves no apparent legitimate business purposes in this case. The flow charts prepared by the Commissioner show

a nonsensical scheme of transactions whereby one corporation would transfer a parcel of property to another corporation only to have it transferred back in several cases. The petitioner admitted to Revenue Officer Smith that this was done to avoid lien creditors.

Whether or not the petitioner's alter ego corporations were also used with intent to avoid payment of taxes is not at issue in this case. Rather, the issue is whether the petitioner's well documented use of alter ego or shell corporations jeopardizes the collection of taxes. Other cases have considered this use of shell corporations to be a factor in concluding that jeopardy exists. *See Zion Coptic Church, Inc. v. United States,* 44 A.F.T.R.2d para. 79–5010 (S.D. Fla.1979). In this case it took the Commissioner over 3,000 hours to track down 75 corporations; perhaps 25 remain, as yet, unfound. The petitioner's ability to conceal assets in these corporations clearly creates jeopardy in this case.

### 3. *Numerous quick transfers between alter ego corporations.*

As noted above, the petitioner has shown an ability to create new corporations and quickly transfer assets to and from these corporations. In this regard, the conclusion of the court in *French v. United States,* 79–2 U.S.T.C. para. 9538 (E.D.Okl.1979) is herein noted with approval. In that case the court noted that one of the standards expressly adopted by Congress for use in determining whether jeopardy exists is whether the taxpayer appears to be "designing quickly to place his property beyond the reach of the Government ... by transferring it to other persons ...." The court in *French, supra,* noted that "the modifying term 'quickly' must be read in the context of the purpose of Section 6861 as meaning 'prior to the time that the Government can undertake collection activities.'" In this case, as in *French, supra,* collection could not otherwise begin until after the Tax Court rendered its decision. In this period, which could be years, this petitioner could create dozens of new corporations and

transfer his assets to them thus jeopardizing the Government's collection ability.

### 4. *Failure to keep and maintain adequate and accurate records.*

Despite written notice provided to the petitioner of his obligation to keep adequate records, he has consistently failed to keep appropriate and detailed books and records as required by law. See Code Sections 6001 and 7203 and the regulations promulgated thereunder. In response to summonses issued to the petitioner and his numerous corporations, the petitioner has produced a surprising paucity of records given the complexity and extent of his real estate transactions. This failure to keep adequate records has also been considered as a factor in holding that a jeopardy assessment was reasonable under the circumstances. *Haskin v. United States,* 444 F.Supp. 299 (C.D.Cal. 1977). Clearly the petitioner's constant and knowing failure to keep adequate records jeopardizes the Commissioner's attempts to locate assets belonging (in reality) to the petitioner.

### 5. *Failure to file corporate returns and failure to report appreciable income on personal returns.*

The petitioner now admits that he has over 100 corporations which are actually his alter egos. However, the great majority of petitioner's corporations have never filed corporate income tax returns. Those which have filed returns do not show any appreciable income. Despite these facts and the petitioner's concession of the alter ego issue, he has not reported any appreciable income on his personal income tax returns during the years in question. Indeed, the petitioner's returns as originally filed show no income whatsoever from sales of real property. Rather, the petitioner reported only small amounts of income received as "fees" presumably from his stated occupation as an "engineer," and a small amount of rental income. These facts are consistent with the Commissioner's determination that the collection of taxes is in jeopardy in that the taxpayer has obviously attempted to

conceal and underreport income. *See Loretto, Jr. v. United States, supra; Nicholas v. United States,* 79–1 U.S.T.C. para. 9193 (E.D.Cal.1978); *Lace v. United States,* 79–2 U.S.T.C. para. 9692 (D.Vt.1979); and *Noell v. United States,* 79–1 U.S.T.C. para. 9389 (S.D.Cal.1979).

#### 6. *Apparent illegal "skimming operation."*

Although illegal activity itself is not essential to a finding of jeopardy, it appears that the petitioner here has been and is presently engaged in a systematic "skimming operation: with respect to his corporations. As noted in the case of *Fidelity Leasing Corp. v. United States,* 462 F.Supp. 845, 849 (N.D.Ga.1978), a "skimming operation" is the non-reporting of income from whatever source derived. As noted above, the petitioner's corporations have, in almost every case, failed to report any income from the sale of land even though these corporations have been involved in several hundred land sales and even though they now hold over two million dollars worth of real property. The petitioner has reported only nominal income on his personal income tax returns. Certainly it is reasonable for the Internal Revenue Service to conclude that an individual who has been engaged in such a comprehensive and expansive illegal "skimming operation" will not stand idly by and allow the Service to collect these taxes. The petitioner here has shown a manifest determination to evade the payment of taxes; certainly it is reasonable to conclude that this taxpayer will continue to use any means to continue this evasion. Certainly "it was reasonable for the Government to decide that the only way to *insure* (emphasis original) the collection of revenue deficiencies was to [use] the jeopardy assessments." *Fidelity Equipment Leasing, Inc. v. United States, supra.*

#### 7. *Dealings primarily in cash.*

The petitioner in this case has been shown to deal primarily in cash and cashier's checks. As noted in the Findings of Facts, summonses issued to banks in and around the area where the petitioner conducts his known business disclosed that the petitioner had only one checking account which had only nominal use. Bills and debts were paid by cashier's check or in cash. This is not consistent with the scope and nature of the petitioner's extensive real estate business. This is, however, consistent with an attempt to conceal unreported income, *United States v. Doyle, et al.,* 80–2 U.S.T.C. para. 9239 (E.D.Wisc.1980).

#### 8. *False financial statements.*

The petitioner's false financial statements, signed under the penalties of perjury, show that the petitioner has consistently attempted to conceal his assets from the Commissioner. While it cannot be determined with certainty that the petitioner will continue in his attempts to conceal assets, such certainty need not be demonstrated. Rather, what is required is a reasonable belief that jeopardy exists. Given the petitioner's past attempts to conceal assets, it is certainly reasonable to believe that he will continue in this course of conduct. Therefore, it is reasonable to conclude that jeopardy exists.

#### 9. *History of non-payment of taxes.*

The petitioner in this case has a history of non-payment of personal income tax as well as withholding and FICA taxes for his corporation. Though the petitioner has claimed to be a self-employed "engineer", he has consistently failed to make estimated tax payments as required by law. See Code Sections 6153 and 6315. When the petitioner has filed personal income tax returns (usually not in a timely manner), he has failed to pay the tax due on those returns. In fact, the petitioner's transcripts of accounts with the Internal Revenue Service show that the petitioner has consistently refused to voluntarily pay his taxes, thus forcing the Internal Revenue Service to attempt collection by levy or seizure. This refusal to voluntarily pay taxes, when considered in conjunction with the petitioner's complex and consistent scheme of placing assets beyond the reach of the Internal

Revenue Service, leads to the inescapable conclusion that the jeopardy procedures are the only means to *insure* the payment of the taxes at issue in this case.

10. *Purchases in the names of other individuals.*

As noted in the Findings of Facts, above, the petitioner, through his corporation Yelson Land Corp., obtained property through a court decree. This decree was entered after Notices of Federal Tax Liens had been filed. The petitioner had a portion of this land placed in the name of his attorney "as Trustee" for him although there was no written trust agreement. The attorney advised that he and Mr. Felkel were operating under a "gentleman's agreement." This constitutes a purchase of property in another's name, *see Lace v. United States, supra,* which effectively avoided the Government's tax liens. This is further proof that the petitioner's "business methods" create jeopardy in this case.

B. AMOUNTS OF ASSESSMENTS.

■ 11. In determining whether the amounts of the assessment in this case are "appropriate," the burden is on the petitioner to show that the amounts assessed are not "appropriate under the circumstances." Code Section 7429(g)(2). The amounts assessed are presumed to be reasonable and appropriate under the circumstances. Further, this Court is not called upon to determine the exact amount of the petitioner's tax liability. Rather, this Court must determine whether the amounts of the assessments are appropriate under the circumstances.

■ This court is aware of the circumstances under which the Commissioner was working in trying to determine the correct assessment. The petitioner's failure to keep adequate records or to produce upon request substantiation of his basis in the subject properties precluded any meaningful determination of his basis for purposes of the assessment. The Commissioner considered the documents submitted by the petitioner in arriving at the amount of the

jeopardy assessment, an amount which, at present, appears appropriate under the circumstances.

However, at the hearing on this matter held June 3, 1983, the petitioner produced as Exhibit # 3, the report of his accountant, Mr. W. Vernon Poston, a report not fully available to the Commissioner prior to this hearing. Upon cursory review of this report, counsel for the Commissioner conceded that an abatement of the assessment in an amount of up to $250,000.00 might be found to be appropriate, given adequate substantiation of the report's entries.

Under the authority granted to this Court pursuant to 26 U.S.C. § 7429(b)(3), the Court will allow the petitioner an opportunity, within 30 days of the entry of this order, to petition the Court for an abatement of the assessment, based upon Mr. Poston's report and the underlying documents which substantiate it. In absence of a second petition within the 30 day period, the assessment of $4,366,812.58 will stand as appropriate.

Based on the foregoing, IT IS HEREBY ORDERED:

1. This Court has jurisdiction over these proceedings pursuant to Section 7429(b) of the Internal Revenue Code of 1954 (26 U.S. C.), and 28 U.S.C., Sections 1340 and 1346(a)(1).

2. The Commissioner, in making the jeopardy assessments against St. Elmo Felkel for the years 1974, 1975, 1976, 1977, 1978, 1979, 1980 and 1981, acted reasonably under the circumstances.

3. The amounts of the jeopardy assessments for the years 1974, 1975, 1976, 1977, 1978, 1979, 1980 and 1981, totalling $4,366,812.58, are appropriate under the circumstances, subject to petitioner having leave, within 30 days, to file a petition for an abatement of the amount assessed, all as more fully set forth previously.

4. The relief prayed for by the petitioner in his Petition is denied. The petitioner shall take nothing by his present Petition. Jurisdiction over the present action is retained pending the expiration of 30 days.