**CENTRAL DE GAS DE CHIHUAHUA, S.A., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**HIDRO GAS JUAREZ, S.A., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**ATLAS LEASING, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Nos. EP–91–CA–310R to EP–91–CA–312R. Nos. 91–0854R–01, 91–082R–01 and 91–0855R–01.

United States District Court, W.D. Texas, El Paso Division.

April 29, 1992.

George W. Connelly, Chamberlain, Hrdlicka, White, Williams & Martin, Houston, Tex., for plaintiffs.

Mary C. Vance, Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

RUESCH, United States Magistrate Judge.

Plaintiffs filed these three cases seeking judicial review, under 26 U.S.C. § 7429(b), of jeopardy assessments imposed by the Internal Revenue Service (IRS). The parties consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c) and requested consolidation of the evidentiary hearings. The consolidated evidentiary hearings were held on April 16 and 17, 1992. Plaintiffs were represented by George W. Connelly of Houston, Texas and the Government was represented by Mary C. Vance, an attorney in the Tax Division of the Department of Justice. The jeopardy assessments were issued by the IRS on April 15, 1991.[1]

The taxpayers and the kinds of taxes assessed against each are as follows:

1. HIDRO GAS JUAREZ, S.A., ("HIDRO") is a Mexican corporation owned by Miguel Zaragoza Fuentes, a citizen and resident of Mexico. During the years in question and up to the present, HIDRO has purchased LPG (liquified petroleum gas or liquid propane gas) in the United States and has transported it in trucks to Mexico where the LPG has been sold. The jeopardy assessment is based on HIDRO's failure to pay diesel fuel tax and leaking underground storage tank excise tax for the quarters beginning March 31, 1980 and ending June 30, 1990. The Government alleges that, although HIDRO has purchased the diesel fuel for its transport trucks in Mexico, the diesel fuel tax is due because the Mexican diesel fuel is used to operate the trucks on public streets and highways in the United States. The assessed tax, penalties, and interest total more than $2 million.

2. ATLAS LEASING, INC. ("ATLAS") is a Texas corporation also owned by Miguel Zaragoza Fuentes. ATLAS was created in 1985 for the purpose of purchasing from HIDRO, and leasing back to HIDRO, the trucks used by HIDRO to transport the LPG. Two jeopardy assessments were issued against ATLAS: one for failure to pay withholding tax for the years 1985 to and including 1989, and the other for failure to pay income tax for the years 1988 and 1989. The assessed taxes, penalties, and interest total more than $2 million.

3. CENTRAL DE GAS DE CHIHUAHUA, S.A., ("CENTRAL") is a Mexican corporation also owned by Miguel Zaragoza Fuentes. In 1989 and 1990, CENTRAL became the owner of the trucks used by HIDRO to transport LPG. The jeopardy assessment is based on CENTRAL's failure to pay income tax for the year 1990. Because CENTRAL leased the trucks to HIDRO but claimed no rental income, the IRS imputed rental income to CENTRAL. The assessed tax and interest total more than $700,000.

■ The IRS is authorized to make jeopardy assessments and thereby immediately collect taxes when it believes that delay, which is part of the normal assess-

1. The statutory requirement that a decision be made within 20 days of the "commence[ment]" of the case was not followed. 26 U.S.C. § 7429(b)(3).

ment and collection procedure, will jeopardize collection of the tax. 26 U.S.C. §§ 6861, 6862; *Walker v. United States*, 650 F.Supp. 877, 880–881 (E.D.Tenn.1987). Judicial review of the IRS's decision is obtained in a suit filed by the taxpayer in federal district court after the taxpayer has requested administrative review of the assessment. 26 U.S.C. § 7429(b); *Felkel v. United States*, 570 F.Supp. 833, 835 (D.S.C. 1983); *DeLauri v. United States*, 492 F.Supp. 442, 443–444 (W.D.Tex.1980); *Loretto v. United States*, 440 F.Supp. 1168, 1170 (E.D.Pa.1977). The court is required to make a *de novo* determination of two issues and its decision cannot be appealed. 26 U.S.C. § 7429(b)(3) & (f); *Walker*, 650 F.Supp. at 881; *Loretto*, 440 F.Supp. at 1170 n. 2, 1171–1172. The two issues are: (1) whether the making of the jeopardy assessment "is reasonable under the circumstances," and (2) whether the amount assessed "is appropriate under the circumstances." 26 U.S.C. § 7429(b)(3)(A)(i) & (ii); *Harvey v. United States*, 730 F.Supp. 1097, 1104 (S.D.Fla.1990); *Walker*, 650 F.Supp. at 881; *Felkel*, 570 F.Supp. at 838; *Barry v. United States*, 534 F.Supp. 304, 307 (E.D.Pa.1982); *DeLauri*, 492 F.Supp. at 445; *Fidelity Equip. Leasing Corp. v. United States*, 462 F.Supp. 845, 849, 850 (N.D.Ga.1978). The Government has the burden of proof on the first issue and the taxpayer has the burden of proof on the second. 26 U.S.C. § 7429(g)(1) & (2); *see, eg., Harvey*, 730 F.Supp. at 1105; *Walker*, 650 F.Supp. at 881; *DeLauri*, 492 F.Supp. at 445, 446. These three Plaintiffs are not contesting the second issue and have presented no evidence or arguments on that issue. Thus, the only question is whether the making of each jeopardy assessment was reasonable under the circumstances.

■ The standard of proof by which reasonableness must be established is described as something more than "not arbitrary or capricious" and something less than "substantial evidence." *Harvey*, 730 F.Supp. at 1104; *Walker*, 650 F.Supp. at 881; *Felkel*, 570 F.Supp. at 838; *Barry*, 534 F.Supp. at 308; *DeLauri*, 492 F.Supp. at 445; *Loretto*, 440 F.Supp. at 1172; *but*

*see George F. Harding Museum v. United States*, 674 F.Supp. 1323, 1326 (N.D.Ill. 1987) (the standard is similar to probable cause in a preliminary hearing in a criminal case).

■ The evidence which is admissible and on which the court can rely includes evidence that would not be admissible in a civil or criminal trial. *See Harvey*, 730 F.Supp. at 1104; *Billig v. United States*, 1981 WL 1898, at *3, 49 A.F.T.R.2d (P.–H.) 82–479, 82–480, 81–2 U.S.T.C. (CCH) para. 9792 at 88,635 (N.D.Ga.1981). Such evidence includes affidavits, *McAvoy v. IRS*, 475 F.Supp. 297, 299 (W.D.Mich.1979); *Bremson v. United States*, 459 F.Supp. 121, 122 & n. 2, 123, 125 & n. 11, 127 & n. 15 (W.D.Mo.1978); *Loretto*, 440 F.Supp. at 1171 & n. 4, even affidavits containing Government agents' conclusions and opinions, *Bremson*, 459 F.Supp. at 127, 128, hearsay, *Id.; French v. United States*, 1979 WL 1430, at *2, 44 A.F.T.R.2d (P.–H.) 79–5653, 79–5654, 79–2 U.S.T.C. (CCH) para. 9538, at 87,948 (E.D.Okla.1979) (information that the revenue agent learned from individuals); *Bean v. United States*, 618 F.Supp. 652, 656–657 (N.D.Ga.1985) (information that the IRS agent learned from other IRS personnel), including hearsay from confidential sources, *Bean*, 618 F.Supp. at 656 (information that the IRS agent learned from "reliable sources"), documents submitted as exhibits, *Loretto*, 440 F.Supp. at 1171, and, of course, testimony, *Welch v. United States*, 575 F.Supp. 464, 466 (S.D.Miss.1983); *Bremson*, 459 F.Supp. at 122 n. 3. In short, courts "must consider any information that has a bearing" on the two issues the court must address. *Bremson*, 459 F.Supp. at 125; *see also, McAvoy*, 475 F.Supp. at 298; *Loretto*, 440 F.Supp. at 1173. This evidence includes information unknown to the IRS when it made the jeopardy assessment but discovered after that time. *Harvey*, 730 F.Supp. at 1104; *DeLauri*, 492 F.Supp. at 445; *McAvoy*, 475 F.Supp. at 298; *Loretto*, 440 F.Supp. at 1173–1174.

In these three cases, the evidence consisted of each party's exhibits which were admitted without objection from the oppos-

ing party, an affidavit admitted as an exhibit, Plaintiffs' stipulations to which the Government agreed, and Government-offered testimony which included hearsay. Plaintiffs offered nothing other than their stipulations and exhibits.

In order to establish a reason to believe that the collection of a tax is in jeopardy, the IRS typically relies on one of the following three factors:

(1) The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself;

(2) The taxpayer is or appears to be designing quickly to place his property beyond the reach of the Government either by removing it from the United States, or by concealing it, or by transferring it to other persons, or by dissipating it; or

(3) The taxpayer's financial solvency appears to be imperiled.

*Harvey,* 730 F.Supp. at 1104; *DeLauri,* 492 F.Supp. at 445; *Fidelity Equip.,* 462 F.Supp. at 849. In these three cases, the Government relies on the second factor and claims that the taxpayers are designing quickly to place their property beyond the reach of the Government.

■ To establish this point, the Government offered the same evidence for each of the three corporate Plaintiffs because each is, or during its existence was, owned by the same person, Miguel Zaragoza Fuentes. Specifically, in order to establish jeopardy in the collection of taxes from these corporate Plaintiffs, the Government relies, in part, on the actions Miguel Zaragoza Fuentes took through another corporation he owned. This court has read no jeopardy assessment case in which the taxpayer was a corporation and in which the Government, to establish jeopardy of the taxpayer corporation, relied on acts performed by the corporation's owner through other corporations he owned. In the typical case, the taxpayer is an individual who operates through shell corporations and thereby conceals assets from the IRS. *Harvey,* 730 F.Supp. at 1101, 1107; *Bean,* 618 F.Supp. at 655; *Felkel,* 570 F.Supp. at 835, 836, 838, 839; *Haskin v. United States,* 444

F.Supp. 299, 302 (C.D.Calif.1977); *see Bremson,* 459 F.Supp. at 126. Here, the taxpayers are corporations owned by the same person. Thus, the question is whether the acts of Miguel Zaragoza Fuentes, which were performed as the owner of another corporation, can be used to establish jeopardy for Plaintiff corporations which are also owned by Miguel Zaragoza Fuentes. The answer is "yes" because the evidence discloses that Miguel Zaragoza Fuentes does not make distinctions between himself and his corporations and that he acts through his corporations. Thus, acts he takes through one corporation can be used to predict the acts he will take through other corporations. The evidence supporting this conclusion will be discussed in chronological order along with the evidence establishing the reasonableness of the jeopardy assessments.

■ Miguel Zaragoza Fuentes lives in Mexico, is a citizen of Mexico, and does not pay United States personal income tax. In 1985 and before, Miguel Zaragoza Fuentes owned a company operating in the United States called Southwest Petroleum Company, Inc. ("Southwest"). Pltfs' Exh. 2. Southwest bought LPG in the United States and sold it to Mexican corporations and some United States entities. *Id.* In May 1985, the IRS audited Southwest for the years 1981 through 1984 (*Id.*) and ultimately determined that Southwest owed more than $21 million in taxes.

On October 22, 1985, IRS agents met with representatives of Southwest (attorney Robert Gibson and certified public accountant Leonard Starr) in what the IRS calls a "closing conference." At that time, the IRS agents were informed that Southwest had no assets in the United States and that all of its corporate bank accounts had been closed.

Plaintiffs argue that Southwest died a natural, economic death in 1985 and the IRS audit had nothing to do with the corporation's demise. Specifically, Plaintiffs argue that Southwest was owned by Miguel Zaragoza Fuentes and his brother, Eduardo Zaragoza Fuentes, and they let the corporation die during the IRS audit because they

could not agree on how to run the corporation. This argument is not supported by the facts. On May 1, 1985, in answer to questions posed by the IRS, Miguel Zaragoza Fuentes, as president of Southwest, stated that, from 1981 to 1984, he owned 75 percent of Southwest's stock and his brother owned the other 25 percent. Pltfs' Exh. 2. He also stated that "[o]n or about February 20, 1985, the corporation redeemed its shares owned by Eduardo Zaragoza Fuentes." *Id.* In other words, as of late February 1985, Miguel Zaragoza Fuentes was the sole owner of Southwest; thus, by that time, any corporate disagreements he had had with his brother had ended. The IRS audit continued until at least the closing conference on October 22, 1985. Thus, from February to October 1985, Miguel Zaragoza Fuentes was the sole owner of Southwest. If under his stewardship Southwest had died a natural, economic death, that fact would indicate that Southwest's LPG business was not profitable. However, Miguel Zaragoza Fuentes did not get out of the LPG business; instead, he continued operating this business through Plaintiff HIDRO, with the help of Plaintiff ATLAS and Plaintiff CENTRAL, as discussed below.

The IRS obtained information from two informants concerning the demise of Southwest. One, whose identity was not disclosed, was a high level officer of one of Miguel Zaragoza Fuentes' corporations. The other testified. Her name is Cristina Fuentes and she worked for Southwest, the Plaintiff ATLAS, and Caribbean Gas, Inc., another corporation owned by Miguel Zaragoza Fuentes. Both informants said that after the IRS began its investigation of Southwest, the corporate assets were transferred out of the United States. The confidential informant had obtained his/her information from Eduardo Zaragoza Fuentes. Ms. Fuentes attended conferences with the Zaragoza brothers and corporate counsel during which the transfer of Southwest's assets out of the United States to avoid the IRS was discussed.

As to the identity of the transferred assets, both the confidential informant and Ms. Fuentes said that Southwest owned railroad cars which were taken to Mexico.[2] Both said that the railroad cars were ultimately divided between Miguel Zaragoza Fuentes and Eduardo Zaragoza Fuentes.

Plaintiffs argue that the railroad cars were taken to Mexico and divided between the two brothers before the beginning of the IRS audit; thus, transferring the railroad cars to Mexico had nothing to do with the audit. The record does not contain an exact date as to when the IRS first notified Southwest of the audit. But the IRS submitted questions to Southwest as early as January 29, 1985. Pltfs' Exh. 2. Thus, the audit began on or before that date. If Southwest first got notice of the audit on January 29, 1985, and if Miguel Zaragoza Fuentes bought out his brother "[o]n or about February 20, 1985" (Pltfs' Exh. 2), there was time for the railroad cars to be taken to Mexico in response to the IRS audit. In addition, there was time for the division of the cars between the two brothers as payment, or partial payment, for Eduardo Zaragoza Fuentes' 25 percent stock in the corporation. Thus, there is reason to believe that the railroad cars were moved in response to the IRS audit. Furthermore, the division of the railroad cars between the two brothers is one example of how Miguel Zaragoza Fuentes has treated corporate assets as personal assets.

Ms. Fuentes also testified that Eduardo Zaragoza Fuentes told her and her secretary that, because of the IRS audit, he did not want invoices in the name of Southwest. So he directed her and her secretary to remove invoices in Southwest's name and create invoices in the names of Texas Gas and Oil and Atlantic International, Inc., another corporation controlled by Miguel Zaragoza Fuentes. Considering the dates discussed above, there was plenty of time for these instructions to have been given during the IRS audit but before

---

**2.** In his answers to the IRS' questions in 1985, Miguel Zaragoza Fuentes confirmed that Southwest had railroad cars. Pltfs' Exh. 2, question

17. He said the corporation had 228 of them. *Id.*

Eduardo Zaragoza Fuentes was bought out on February 20, 1985.

In early 1988, a revenue agent contacted Southwest's attorney, Robert Gibson, to obtain information about Southwest's assets so that the IRS could attempt to collect the taxes. Attorney Gibson obtained the following information from his client and conveyed it to the revenue agent: Southwest had railroad cars which were in Mexico, a bank account at the ABC Bank in El Paso, office furniture in a storage container in El Paso either on Alameda Street or near Bassett Center, and a plane that flew in and out of El Paso.[3] The bank account contained a total of $25. Without additional information, it was impossible to find the office furniture in the numerous storage lockers on Alameda Street or near Bassett Center. In 1988, authorities at the El Paso International Airport said that they had no record of Southwest's plane.

In July 1991, Plaintiffs' present attorney gave the IRS a copy of a lease agreement showing that, on June 11, 1987, Southwest leased a hangar at the El Paso International Airport for its plane, a twin engine Cessna model 414A. Pltfs' Exh. 1; Gov't Exh. 15. The hangar leased by Southwest was # CC–7. *Id.* With this information, IRS agents went to the El Paso International Airport and learned some interesting things. Plaintiff HIDRO had rented a hangar at the airport. Southwest's plane was listed under HIDRO in the airport's files because, as a bookkeeper said, Southwest and HIDRO were the same. Southwest originally wrote checks for the $200 monthly rental fee; later HIDRO paid for the rental of Southwest's hangar. The last page of the lease agreement contains a business address for Southwest at 7605 Boeing in El Paso. Pltfs' Exh. 1; Gov't Exh. 15. A handwritten note on this page says "same address as Hidro Gas Juarez." Not surprisingly, Southwest's plane was found in HIDRO's hangar, # UU–8. The only record at the airport of this fact was a small note in HIDRO's file. Southwest's plane was moved to HIDRO's hangar after someone representing HIDRO complained

that Southwest's hangar had a leak. This HIDRO representative asked that Southwest's plane be moved to hangar # UU–8 but requested that Southwest's lease not be changed. In September 1991, the IRS seized the plane and sold it to partially collect the tax owed by Southwest.

Thus, Southwest did not die in 1985 because it entered into a lease for its plane in the summer of 1987 and it still owned the plane in the summer of 1991. In addition, this evidence shows that Miguel Zaragoza Fuentes successfully concealed the plane from the IRS for four years and did so by not disclosing to the revenue agent in 1988 that Southwest had leased a hangar for its plane in 1987, by putting Southwest's plane in the hangar of another corporation Miguel Zaragoza Fuentes owned, and by paying for Southwest's lease with the checks of another corporation he owned. The latter fact also shows that Miguel Zaragoza Fuentes mixes the assets of one corporation with the assets of another.

Within two months of answering the IRS's questions concerning Southwest, Miguel Zaragoza Fuentes transferred four pieces of real property located in El Paso, Texas to people living in Juarez, Mexico. Gov't Exh. 13. The deed for each piece of property was signed by Miguel Zaragoza Fuentes on June 28, 1985. *Id.* Plaintiffs argue that this evidence is not relevant to the jeopardy assessments made in 1991 because Miguel Zaragoza Fuentes, personally, had no United States source income at that time and thus, had no reason to fear the IRS. However, when Miguel Zaragoza Fuentes answered the IRS's questions concerning Southwest, he was asked whether *he* had bank accounts, safe deposit boxes, or certificates of deposit in any United States banks. Pltfs' Exh. 2, question 10. He answered that he, personally, "may have had" these items in United States banks. *Id.* Considering the dim line drawn by Miguel Zaragoza Fuentes between himself and his corporations, he had reason to fear that his personal property might be exposed to the IRS. Furthermore, one of these four pieces of property

---

**3.** Ms. Fuentes also testified that Southwest owned a plane.

was held in the name of "Miguel Zaragoza d/b/a Hidro Gas Juarez," which is one of the Plaintiffs in these cases. Gov't Exh. 13. On June 28, 1985, Mr. Zaragoza signed this deed "Miguel Zaragoza" under which is typed "MIGUEL ZARAGOZA, d/b/a HIDRO GAS JUAREZ." *Id.* Holding title in this manner is another example of Miguel Zaragoza Fuentes' blurring the line between personal and corporate assets.

Although Southwest continued in existence after 1985, as discussed above, it stopped operating its normal business in the United States in that year. In 1985, Miguel Zaragoza Fuentes created Plaintiff ATLAS, a Texas corporation. Before 1985, Plaintiff HIDRO owned most of the trucks and trailers it used to transport LPG in the United States and Mexico. ATLAS was created to purchase HIDRO's trucks and trailers and lease them back to HIDRO. Under this scheme, if the IRS wanted to seize HIDRO's assets, the IRS would not be able to seize both the vehicles and the LPG in the vehicles because HIDRO did not own the vehicles, although it owned the LPG.[4] Indeed, Ms. Fuentes testified that making an IRS seizure difficult was Miguel Zaragoza Fuentes' reason for creating ATLAS.

The financial transaction through which Plaintiff ATLAS purchased Plaintiff HIDRO's trucks and trailers, as well as an airplane, is another example of the mixing of Miguel Zaragoza Fuentes' personal and corporate assets. That transaction occurred as follows: Miguel Zaragoza Fuentes deposited $5 million in a certificate of deposit at the Bank of Montreal in the Bahamas (the "Bank"); ATLAS then borrowed $5 million from the Bank to purchase HIDRO's trucks and trailers and an airplane. On June 19, 1985, ATLAS signed a promissory note to the Bank for $5 million (Pltfs' Exh. 9) and executed a chattel mortgage on the trucks, trailers, and plane in favor of the Bank (Pltfs' Exh. 8).[5] ATLAS never paid any principal on the loan; it was required to pay only interest. However, ATLAS, itself, did not pay the interest; ATLAS never wrote checks to the Bank nor deposited money into the Bank for the interest on its loan. Instead, the interest earned on Miguel Zaragoza Fuentes' $5 million certificate of deposit was accepted by the Bank as the interest owed by ATLAS on its loan. Thus, interest income that belonged to Miguel Zaragoza Fuentes, personally, was used to pay the interest owed by his corporation on the corporation's loan. In addition, ATLAS used the interest as a deduction on its corporate income tax returns for tax years 1985 through 1989. Gov't Exhs. 6–10 (line 18 on each tax return).

This financial transaction had at least two effects:

(1) ATLAS obtained a tax deduction for interest it did not pay[6] and

(2) ATLAS did not acquire equity in the trucks and trailers held in its name. Thus, even though ATLAS was a United States corporation doing business in the United States, it had no equity in its major assets, the trucks and trailers that HIDRO operated in the United States.

ATLAS' disbursement of the $5 million from its loan also raises questions. On June 19, 1985, ATLAS issued two checks: one to HIDRO for $4,038,500.00 for HIDRO's trucks and trailers, and one to Myrna Alicia Zaragoza Lopez ("Myrna Zaragoza"), Miguel Zaragoza Fuentes' daughter, for $900,000.00 for a Cessna model 550 plane. Gov't Exh. 11. The trucks, trailers, and the plane are listed on the chattel mortgage ATLAS signed in favor of the Bank on June 19, 1985. Pltfs' Exh. 8. A couple of weeks later, on July 1, 1985,

---

**4.** After the issuance of the jeopardy assessment against HIDRO, the IRS seized the LPG owned by HIDRO in one vehicle owned by another corporation. The agent testified that seizing the LPG was very difficult to accomplish.

**5.** Thus, ATLAS was created by June 19, 1985, a month and one-half after Miguel Zaragoza Fuentes answered the IRS' questions concerning

Southwest (Pltfs' Exh. 2) and nine days before Miguel Zaragoza Fuentes transferred his real property in El Paso to people living in Juarez, Mexico (Gov't Exh. 13).

**6.** In November 1990, the IRS approved this interest deduction for ATLAS' 1987 tax year. Pltfs' Exh. 5.

Myrna Zaragoza signed a bill of sale in which she sold the Cessna 550 to ATLAS. Gov't Exh. 11. Plaintiffs have no explanation for the fact that Myrna Zaragoza signed a bill of sale for the plane on July 1, 1985, which was after the plane was listed as an asset of ATLAS on its chattel mortgage dated June 19, 1985.

ATLAS' check to HIDRO was endorsed by Miguel Zaragoza Fuentes and deposited into HIDRO's account #834. Gov't Exh. 11. ATLAS' check to Myrna Zaragoza was deposited into the same HIDRO bank account. *Id.* Plaintiffs have no explanation for why Myrna Zaragoza deposited her check into the HIDRO account if the plane actually belonged to Myrna Zaragoza. Nor did Plaintiffs explain why Myrna Zaragoza signed the bill of sale if the plane did not belong to her. The actions of Myrna Zaragoza regarding the Cessna 550 are another example of the mixing of corporate and personal assets although, in this example, the individual was Miguel Zaragoza Fuentes' daughter.

In a lease agreement dated August 1, 1985, ATLAS leased the Cessna 550 to HIDRO. Gov't Exh. 11(b). ATLAS also leased the trucks and trailers to HIDRO (see Pltfs' Exhs. 8, 13) and charged a rental fee of ten cents per mile. The result of ATLAS' transactions was that it never had taxable income while it existed from 1985 to 1989. Gov't Exhs. 6–10. Plaintiffs argued that, even at ten cents per mile, AT-LAS could have had taxable income if the trucks and trailers had traveled enough miles. However, the evidence disclosed that the trucks and trailers were operated by HIDRO between El Paso, Texas and Juarez, Mexico, which are contiguous cities with only the Rio Grande River between them. Specifically, HIDRO kept the trucks parked in a lot in Juarez, Mexico. Each truck was empty when it left the Juarez parking lot and headed for El Paso. Each truck was loaded with LPG in El Paso and returned to Juarez.

ATLAS ceased operating sometime after Plaintiff CENTRAL, a Mexican corporation owned by Miguel Zaragoza Fuentes, paid off ATLAS' $5 million loan at the Bank on May 12, 1989. See Pltfs' Exh. 8; Stipulation #12. Thus, CENTRAL took over AT-LAS' role as the owner of the trucks and trailers leased to HIDRO.

The Government argues that CENTRAL's purchase of ATLAS's assets is another example of Miguel Zaragoza Fuentes' transfer of assets to avoid the collection of taxes from one of his corporations, ATLAS in this example. However, the IRS did not notify ATLAS of its audit of ATLAS' tax returns until the IRS sent ATLAS a letter dated January 11, 1990. Gov't Exh. 1. After that date, titles to more than 100 of ATLAS' trucks and trailers were transferred to CENTRAL. Gov't Exh. 5. Plaintiffs argue that, because CENTRAL paid off ATLAS' loan on May 12, 1989, before the IRS audit letter of January 11, 1990, and because CENTRAL began transferring title to ATLAS' vehicles in 1989, the title transfers were not an attempt to avoid the collection of ATLAS' taxes. There are problems with Plaintiffs' argument.

First, in ATLAS' 1989 tax return, it did not disclose the takeover by, or sale of assets to, CENTRAL. Gov't Exh. 10. And, on January 23 and 24, 1990, days after the IRS audit letter, ATLAS' attorney sent letters to the Texas Department of Motor Vehicles regarding the transfer of ATLAS' vehicles to CENTRAL. Gov't Exhs. 3, 4. Plaintiffs rely on documents in Government Exhibit 17 to show that the transfer of titles of the trucks and trailers began in 1989, before the audit letter. However, the evidence of 1989 title transfers in Government Exhibit 17 is meager. Only three of the more than 100 vehicles ultimately transferred to CENTRAL (Gov't Exh. 5) are represented in the documents in Government Exhibit 17. This exhibit shows that, on June 9, 1989, CENTRAL became the first lienholder of these three vehicles which were owned by ATLAS. Gov't Exh. 17. Thereafter, title to two of these vehicles was transferred by ATLAS to CENTRAL on December 22, 1989 and title to the third was transferred on March 19, 1990. *Id.* Thus, only two of ATLAS' numerous vehicles were transferred to CENTRAL in 1989. A comparison of vehicle identification numbers discloses that

the two vehicles whose titles were transferred to CENTRAL on December 22, 1989 (Gov't Exh. 17), are not listed on ATLAS' chattel mortgage in favor of the Bank (Pltfs' Exh. 8).

Finally, titles to the large majority of ATLAS' vehicles, more than 100, were transferred to CENTRAL after the IRS audit letter of January 11, 1990. Gov't Exh. 5. Specifically, a few title transfers occurred on March 8, 1990; the rest occurred on March 9, 1990 and thereafter. Gov't Exh. 5. Thus, it is reasonable to believe that the transfer of ATLAS' vehicles to CENTRAL is another example of the transfer of assets to avoid the collection of taxes. In addition, both Ms. Fuentes and the confidential informant stated that ATLAS' vehicles were transferred to CENTRAL because the IRS was auditing ATLAS' tax returns.

Finally, the confidential informant stated that the majority of Miguel Zaragoza Fuentes' corporations were set up to avoid paying United States taxes. This statement was confirmed by Ms. Fuentes, who testified that Miguel Zaragoza Fuentes said that he did not want to pay United States taxes because he believed that he was not doing business in the United States.

In conclusion, Miguel Zaragoza Fuentes has blurred the lines between himself and his corporations so that his concealing and transfer of Southwest's assets establish, at least, a reasonable belief that he would do the same through the Plaintiff corporations. And, the record discloses that he has done the same through the Plaintiff corporations.

In 1985, the IRS processed Southwest through the normal assessment and collection procedures and, by the time of the closing conference on October 22, 1985, all of Southwest's assets were gone except for the airplane which was successfully concealed from the IRS until 1991 when Plaintiffs' attorney gave the IRS a copy of Southwest's agreement to lease a hangar at the El Paso International Airport (Pltfs' Exh. 1; Gov't Exh. 15). The effect of ATLAS' operation was that it had no taxable income and no equity in the vehicles which were its major assets operating in the United States. When the IRS became interested in ATLAS, its assets were transferred to CENTRAL, a Mexican corporation. The only asset HIDRO has in the United States is the LPG it purchases in the United States and transports in vehicles owned previously by ATLAS and now by CENTRAL. This division of ownership makes it very difficult for the IRS to seize HIDRO's LPG.

It is therefore ORDERED that Plaintiffs' requests for abatement of the jeopardy assessments against them shall be, and they are hereby, DENIED.