T.C. Memo. 2001-169

UNITED STATES TAX COURT

LARRY DEAN SYKES AND RUBY SYKES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3844-00.                         Filed July 6, 2001.

    Respondent's (R) agents seized $149,200 cash from
petitioners (Ps) during a search of Ps' residence by
Federal and State law enforcement officers.  R filed a
jeopardy assessment in that amount against petitioner
husband (P-H).  P-H filed suit in U.S. District Court
to obtain judicial review of the jeopardy assessment.
The District Court subsequently sustained the
determination that P had taxable income of $48,473 in
1997 and found that P had savings of $100,727.

    R determined that the $149,200 seized from Ps was
unreported taxable income for 1997.  Ps contend that it
was not taxable income because P-H had a cash hoard in
that amount on Dec. 31, 1996.

    Ps moved at trial to shift the burden of proving
the amount of the cash hoard to R under sec. 7491(a),
I.R.C.  Ps offered evidence relating to the amount of
P's cash hoard, but a substantial amount of that
evidence was not credible.

Held:  Ps bear the burden of proving the amount of the cash hoard.

Held, further, P-H had a $40,000 cash hoard on Dec. 31, 1996.

Larry Dean Sykes and Ruby Sykes, pro se.

Robert M. Fowler, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined a deficiency in petitioners' income tax of $45,759 for 1997 and an accuracy-related penalty under section 6662 of $9,151.80.[1]

Respondent determined that $149,200 seized from petitioners' residence on March 19, 1998, was petitioners' taxable income in 1997.  Petitioners contend that it was not taxable income because petitioner Larry Dean Sykes had a cash hoard in that amount on December 31, 1996.

The issues for decision are:

1.  Whether petitioners or respondent bears the burden of proving the amount of petitioners' unreported income.  We hold that petitioners bear the burden of proof.

---

[1]  Respondent determined that petitioner Ruby Sykes is eligible for relief from joint liability under sec. 6015(b).  However, she remains a party to the case.  See DeLucia v. Commissioner, 87 T.C. 804, 811 (1986).

2. Whether $149,200 seized from petitioners' home on March 19, 1998, is petitioners' taxable income from a fencing operation for 1997. We hold that petitioner Larry Dean Sykes had a nontaxable cash hoard of $40,000 on December 31, 1996, and that $109,200 of the $149,200 is taxable income for 1997.

3. Whether petitioners are liable for the accuracy-related penalty imposed by section 6662(a) for 1997. We hold that they are.

References to petitioner are to Larry Dean Sykes. References to Mrs. Sykes are to petitioner Ruby Sykes. Section references are to the Internal Revenue Code in effect during the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners are married and lived in Ozark County, Missouri, when they filed the petition in this case.

Petitioner's father abandoned his family when petitioner was young. Petitioner's mother was disabled. His maternal grandparents raised him and his older brother Danney. Petitioner's grandfather died in 1970.

Petitioners were married in 1977. Mrs. Sykes had a 1-year-old son, Gary, when petitioners married. Petitioner raised Gary

as his son.  Petitioners also had a daughter, Larene, who was born in 1978.

B.  Petitioner's Income-Generating Activities

1.  Petitioner's Employment

Petitioner attended high school from 1966 to 1970.  During those years, he earned about $25 a week working at a store and earned about $10 a week doing odd jobs for his grandmother.

Petitioner worked at a pallet mill in Raymondville, Missouri, in 1970 and 1971.  He worked as a tree trimmer in St. Louis, Missouri, in 1971.  He worked for International Paper in Kansas City, Kansas, from August 1973 to June 1981, where he earned the following amounts:

| Year | Amount |
| --- | --- |
| 1973 | $2,894.69 |
| 1974 | 9,193.38 |
| 1975 | 7,596.16 |
| 1976 | 10,529.20 |
| 1977 | 9,922.32 |
| 1978 | 17,636.94 |
| 1979 | 16,888.69 |
| 1980 | 15,520.12 |
| 1981 | 6,643.49 |
| Total | 96,824.99 |

Petitioner had various odd jobs from 1981 to 1985.  He cut firewood and bought and sold goods at auctions from August 1984 to June 1987.

2.  Petitioner's Purchase and Sale of Residences

    a.  Petitioners' Purchase and Sale of a House in Kansas City

In January 1978, petitioners bought a house at 1700 Washington Avenue in Kansas City, Kansas, for about $16,000. Petitioners lived there from 1978 to 1981. Petitioner bought a new 1979 Ford pickup truck in November 1978 for $6,400. On May 14, 1981, petitioners sold their house in Kansas City for about $17,000.

    b.  Petitioner's Purchase and Sale of a House for His Mother and Grandmother

In July 1980, petitioner and his maternal uncle, Ronald Ireland (Ireland), bought a house in Yellville, Arkansas, for petitioner's mother and grandmother for $20,000. The sellers received an $8,000 downpayment. Petitioner paid either $2,000 or $4,000 of the downpayment.

After a few months, petitioner's mother and grandmother decided they did not want to live in that house, and they moved back to their mobile home in Hartshorn, Missouri. Petitioner's mother and grandmother lived in a nursing home in Harrison, Arkansas, as Medicaid patients beginning in 1990. His grandmother died in 1995. His mother still lives in the nursing home.

In 1981, petitioner traded his 1979 truck for his uncle's share of the house in Yellville. Petitioner and his family moved

from Kansas City to Yellville in 1981 and lived in the house until 1985. In 1985,[2] petitioner sold the house in Yellville for $23,000, including furnishings.

c. Petitioners' Purchase of a Trailer and Mobile Home

In 1986, petitioners bought a 16-foot travel trailer and traveled to Arizona. They lived in Arizona in the trailer for 3 or 4 months. Petitioners moved to Isabella, Missouri, later in 1986, and continued to live in the 16-foot trailer. Mrs. Sykes borrowed about $6,000 in 1989 or 1990 to buy a 60-foot mobile home. Petitioners lived in that mobile home from 1989 or 1990 to the time of trial.

3. Petitioner's Auction Business

From 1987 to the time of trial, petitioner operated an auction business in and around Isabella, Missouri. He bought, sold, and traded consumer goods at auctions in Missouri, Arkansas, Tennessee, Iowa, and Oklahoma. Gary has consistently helped petitioner in his work.

4. Petitioners' AFDC Payments and Mrs. Sykes' Disability and Medicaid Payments

Mrs. Sykes became disabled in 1981. Petitioners received Aid to Families with Dependent Children (AFDC) benefits from June 1987 to June 1995. Mrs. Sykes received Medicaid benefits from

---

[2] The parties stipulated and the buyer's affidavit states that petitioners sold the Yellville house on Apr. 30, 1985, notwithstanding that the warranty deed says Apr. 30, 1986, and petitioner testified that it was in 1986.

October 1989 to February 1998.  She also received Social Security disability benefits of about $494/month, i.e., about $5,928/year, for a period not specified in the record.  In their 1989, 1990, 1991, 1992, and 1993 applications for recertification to receive AFDC and Medicaid benefits, petitioners stated, under penalties of perjury, that they had no property in a safe deposit box and no more than $210 in savings.

C.    The Burglary Ring and Petitioner's Involvement

Michael Collom (Collom) joined a burglary ring formed by Lyndell Shives (Shives) and Billy Wilson (Wilson) early in the summer of 1997.  The ring targeted farmhouses and construction sites in southwestern Missouri.  The ring committed about 100 burglaries, and Collom participated in about half of them.

Collom and his associates sold some of their stolen goods at auctions.  Petitioner met Collom and Shives in June 1997 at an auction in Theodosia, Missouri.  Petitioner wanted to buy goods from them.  From the summer of 1997 to February or early March 1998, Collom sold stolen merchandise to petitioner who resold it at auctions.

D.    Petitioner's Safe Deposit Box

Petitioner rented a safe deposit box at the First National Bank & Trust in Gassville, Arkansas, in December 1987.  He entered his safe deposit box 53 times from December 1987 to March 1998.

Petitioner entered the safe deposit box once in 1998, on March 18. He removed all of the money from the box at that time. His last entry before that date was on December 10, 1997.

E. <u>Execution of the BATF Search Warrant and the Money Seizure</u>

On March 19, 1998, agents of the Bureau of Alcohol, Tobacco & Firearms (BATF) executed a Federal search warrant at petitioners' residence. About 17 law enforcement officials participated in the search, including representatives of the BATF, the IRS Criminal Investigation Division, the Ozark County and Christian County, Missouri, Sheriff's Offices, the Missouri State Highway Patrol, and the Missouri Conservation Commission. The agents were looking for stolen weapons they believed petitioner had received from Collom, Wilson, and Shives and that he intended to sell.

Agents took 11 guns during this raid, 8 of which petitioner had bought from Collom and had been stolen.

During the search, agents found a brown paper bag containing $149,200 in U.S. currency. Petitioner told BATF Special Agent Dan Fridley (Fridley) that he had borrowed about $130,000 of the $149,200, and that $20,000 came from the estate of a deceased relative.

After the agents found the money, they asked IRS Special Agents J. Gregory Pierce (Pierce) and Charles Pearre (Pearre) to interview petitioners. Petitioner told Pierce and Pearre on

March 19, 1998, that the source of the $149,200 was loans from individuals, negotiation of a certificate of deposit, and recent sales of merchandise in his business. Petitioner also told Pierce that the guns seized in the raid had been stolen.

At the end of the search on March 19, 1998, petitioner was arrested by Ozark County authorities. On March 20, 1998, petitioner told detectives in the Christian County Sheriff's Department that he had lied when he said the source of the cash seized was loans. Pierce obtained a warrant on March 25, 1998, authorizing him to seize the $149,200 found at petitioners' residence.

F.    The Jeopardy Assessment

On November 3, 1999, respondent filed a jeopardy assessment of $62,023 against petitioner and issued a notice of the assessment. Petitioner filed suit in the U.S. District Court for the Western District of Missouri to seek judicial review of the jeopardy assessment. On June 1, 2000, Judge Ortrie D. Smith held an evidentiary hearing, at which the parties produced witnesses and documentary evidence. On August 16, 2000, Judge Smith issued an order sustaining the determination that petitioner had taxable income of $48,473 from the fencing operation in 1997. The District Court found that petitioner had saved $100,727 from the following sources: $5,000 saved by 1971, $2,000 saved in 1971, $54,000 saved by 1981 from his job at International Paper Co.,

$6,000 from the sale of his personal possessions when he sold the Yellville house in 1985, $20,000 received from his grandmother in 1986, and $13,727 saved from his auction business from 1989-97.

G.    Court-Ordered Restitution of Assistance Payments

After an investigation in 1999 concerning the Medicaid payments made to Mrs. Sykes, the Missouri Department of Social Services concluded that Mrs. Sykes had obtained Medicaid benefits to which she was not entitled because petitioner owned a safe deposit box containing a large amount of cash during the entire time Mrs. Sykes received Medicaid benefits (1989 to 1998), and Mrs. Sykes had indicated on her application for benefits that she and her husband had no property in a safe deposit box.  The Missouri Department of Social Services issued an adverse action notice on October 14, 1999, requiring her to repay Medicaid benefits of $27,860.

On January 5, 2000, the Circuit Court of Ozark County, Missouri, ordered petitioners to repay $60,965 plus attorney's fees and costs to the Missouri Department of Social Services, Division of Family Services.[3]

On July 24, 2000, petitioners authorized respondent to pay $60,965 to the Missouri Department of Social Services, Division

---

[3]  The record does not show whether the $60,965 petitioners were ordered to repay to the Missouri Department of Social Services included the $27,860 of Medicaid payments Mrs. Sykes was ordered to repay.

of Family Services, from the money to be returned to petitioner pursuant to the order of the District Court.

## H.   Petitioner's Criminal Prosecution

On March 24, 2000, petitioner was indicted by a Federal grand jury in Springfield, Missouri, on one count of conspiracy and two counts of violation of 18 U.S.C. sections 922(j) (knowingly conspiring with others to receive, possess, conceal, store, barter, sell and dispose of stolen firearms) and 924(a)(2) (knowingly receiving, possessing, concealing, storing, bartering, selling, and disposing of stolen firearms).  See United States v. Sykes, No. 00-03021-01-CR-S-1 (W.D. Mo. 2000).  On June 7, 2000, he was convicted on all three counts of the indictment. Petitioner filed an appeal with the U.S. Court of Appeals for the Eighth Circuit in February 2001.[4]

## I.   Petitioners' Income Tax Returns

Petitioners filed tax returns for 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, and 1998, but did not file a return for 1985, 1986, 1987, or 1988.  They reported income on their Federal income tax returns for 1989 through 1998 as follows:

---

[4]  As of May 22, 2001, this appeal remained pending.

| Year | Business gross receipts | Business net profit | Adjusted gross income | Taxable income[1] | Self-employment tax | Total tax | Earned income credit |
|------|------|------|------|------|------|------|------|
| 1989 | N/A | $2,718 | $2,718 | N/A | $354 | $354 | N/A |
| 1990 | $5,879 | 858 | 798 | N/A | 121 | 121 | $110 |
| 1991 | 7,210 | 3,731 | 3,467 | ($10,833) | 527 | 527 | 601 |
| 1992 | 16,935 | 2,702 | 2,511 | (12,689) | 382 | 382 | 465 |
| 1993 | 14,260 | 2,368 | 2,200 | (13,400) | 335 | 335 | 434 |
| 1994 | 15,415 | 2,127 | 1,977 | (14,173) | 300 | 300 | 593 |
| 1995 | 12,087 | 4,271 | 3,969 | (12,581) | 603 | 603 | 1,352 |
| 1996 | 17,908 | 4,181 | 3,885 | (10,465) | 591 | 591 | 1,318 |
| 1997 | 13,724 | 4,387 | 4,077 | (10,773) | 620 | 620 | 1,386 |
| 1998 | 55,430 | 1,993 | 1,852 | (13,348) | 282 | 282 | 638 |
| Total | 158,848 | 29,336 | 27,454 | (98,262) | 4,115 | 4,115 | 6,897 |
| Average per year | 17,650 | 2,934 | 2,745 | (12,283) | 412 | 412 | 766 |

[1] Petitioners reported no taxable income.  This column shows petitioners' adjusted gross income minus the standard deduction for joint filing status and petitioners' personal exemptions.

By notice of deficiency dated December 29, 1999, respondent determined that petitioners had unreported income of $149,200 for 1997 (the amount seized from their residence on March 19, 1998) from petitioner's participation in the fencing operation.

OPINION

A.   Burden of Proof Relating to Petitioner's Cash Hoard

We first decide which party bears the burden of proving the amount of petitioner's cash hoard on December 31, 1996.

1.   <u>Section 7491</u>

Section 7491[5] was enacted in 1998.  See Internal Revenue Service Restructuring & Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001(a), 112 Stat. 685, 726.  Section 7491 applies to court proceedings arising in connection with examinations beginning after July 22, 1998.  See RRA 1998 sec. 3001(c). Respondent's examination in this case began after July 22, 1998. Under section 7491, the burden of proof is placed on the Secretary in any court proceeding if the taxpayer:

---

[5]  Sec. 7491 provides in pertinent part:

SEC. 7491. BURDEN OF PROOF.

(a) Burden Shifts Where Taxpayer Produces Credible Evidence.--

(1) General Rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

(2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--

(A) the taxpayer has complied with the requirements under this title to substantiate any item;

(B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; * * *

(a)  Has complied with substantiation requirements under the Internal Revenue Code.  See sec. 7491(a)(2)(A).  Respondent concedes that petitioners meet this requirement;

(b)  has maintained all records required by the Internal Revenue Code and has cooperated with reasonable requests by the Secretary for information, documents, meetings, etc.  See sec. 7491(a)(2)(B).  Respondent concedes that petitioners meet this requirement;

(c)  introduces, in a court proceeding, credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed under subtitle A or B.  See sec. 7491(a)(1).  Respondent disputes whether petitioners meet this requirement.

In its report for the RRA 1998, the Senate Finance Committee explained the burden of proof provision as follows:

> The burden will shift to the Secretary under this provision only if the taxpayer first introduces credible evidence with respect to a factual issue relevant to ascertaining the taxpayer's income tax liability.  <u>Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted</u> (without regard to the judicial presumption of IRS correctness).  A taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions, frivolous claims, or tax protestor-type arguments.  The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief.  If after evidence from both sides, the court believes that the

> evidence is equally balanced, the court shall find that the Secretary has not sustained his burden of proof. [Emphasis added.]

S. Rept. 105-174, at 45-46 (1998), 1998-3 C.B. 537, 581-582.

Petitioners contend that petitioner had a $149,200 cash hoard on December 31, 1996. Thus, we first decide whether petitioners introduced evidence of petitioner's cash hoard which, after critical analysis, we would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness). See id. at 46, 1998-3 C.B. at 582.

2. Petitioners' Evidence

Petitioner testified that he accumulated a cash hoard over a 30-year period from his various jobs and from selling two houses he owned. He introduced bank records showing that he had a safe deposit box which he entered 53 times from December 1987 to March 1998. Danney Sykes and Gary Sykes each testified that they saw petitioner with a large amount of cash on several occasions.

Petitioner testified that, by 1970, he had saved $4,000 from working at a store and doing odd jobs, and that, by 1971, he had saved another $3,000 from working at a pallet mill and as a tree trimmer. He said that he saved about half of his income from International Paper from 1973 to 1981 and that he had saved $54,000 from International Paper by 1981. He testified that he saved $6,000 from a settlement he received from International

Paper for an injury on the job.  He said that he saved $17,000 from the sale of a house in Kansas City in 1981, and $23,000 from the sale of a house in Yellville in 1985.  He stated that he saved $6,000 from selling personal possessions when he sold the house in Yellville in 1985.  He stated that his grandmother gave him $20,000 in 1986 to replace personal items he had kept in her house and that were lost when the house burned down.  He said that he saved about $22,000 from 1987 to 1997 from his buying and selling activity.

Petitioners' son, Gary, testified that he once "took a bunch of money" from petitioner when he was about 6 or 7 years old and got in a lot of trouble.

Petitioner's brother, Danney, testified that petitioner told him he had saved money for many years.  Danney said:  "Every time I'd turn around he [petitioner] had a roll of bills."  "I've seen him with * * * [what] appeared to be large sums of money."  Danney also testified that petitioner sold his personal items from the Yellville house at auction.

Petitioner's uncle, Ireland, testified that he did not know how much money, if any, his mother (petitioner's grandmother) gave petitioner for items he lost when her house burned down.  Ireland said that petitioner's grandparents lived through the Depression and taught petitioner and him how to save money.  He testified that he saw petitioner with "a lot of U.S. savings

bonds in his car" when petitioner visited him in the early 1980's.  He also saw petitioner with "hands full of money" and "a considerable sum" of money.

3.  Whether Petitioners Introduced Credible Evidence of the Existence and Amount of Petitioner's Cash Hoard

Petitioners introduced credible evidence that petitioner had a cash hoard, such as the fact that he entered his safe deposit box 53 times from December 1987 to March 1998 and that his family saw him with large amounts of cash over the years.  However, petitioners did not introduce credible evidence that petitioner had accumulated $149,200 before 1997.  Petitioner testified that he received a $6,000 settlement from International Paper because he cut his finger while on the job.  However, he did not state when the injury occurred or when he received the money.  He did not mention the alleged payment in the jeopardy assessment proceeding or to respondent before the trial in this case.  Petitioner's explanation of his grandmother's alleged $20,000 gift to him changed over time.  He told Fridley that he received $20,000 from his grandmother's estate in 1992.  He stated in his December 1999 affidavit prepared for the jeopardy assessment proceeding that his grandmother gave him $20,000 in 1986 to replace valuable items he had kept in her house and then lost in a house fire.  At trial, he testified that his grandmother gave him $20,000 shortly before she went into the nursing home; i.e., around 1990.

Petitioners bought the houses in Kansas City and Yellville for $16,000 and $20,000, respectively, and sold them for $17,000 and $23,000, respectively. Petitioner's claim that he made a profit of $40,000 from the sale of those houses is not credible. Petitioner testified that he paid $6,000 towards the purchase price of the Kansas City house from a settlement he received from International Paper for an injury he sustained on the job, and that he paid the remainder owed on the house ($10,000) with wages he received from International Paper. Petitioner's claim that he paid the remainder owed on the house from his wages from International Paper is implausible in light of the fact that he also claims that he saved $54,000 from his $96,825 wages from 1973 to 1981; that would leave less than $33,000 for petitioners to live on for 9 years. Petitioners' claim that they made a $23,000 profit in selling the Yellville house is also implausible. Petitioner and his uncle made an $8,000 downpayment for the Yellville house, and petitioner later traded his pickup truck for his uncle's share of the house. There is nothing in the record to show that petitioner had the means to pay the $12,000 balance on the house and pay petitioners' living expenses while working various odd jobs from 1981 to 1985.

Petitioners contend that petitioner saved half of what he earned. This claim conflicts with their claim that he saved $54,000 from his work for International Paper from 1973 to 1981

and $22,000 from his buying and selling activity from 1987 to 1997 because his total earnings from International Paper were $96,825 (half of this would be $48,413), and his tax returns from 1989 to 1997 show that his adjusted gross income totaled $25,602 (half of this would be $12,801). Petitioner's claim that he saved half of his wages from International Paper is also implausible because that would leave only $48,413 to support himself and his family for 9 years.

Petitioner's claim that he accumulated $149,200 of cash by his frugal lifestyle, e.g., petitioners did not have long distance telephone service, and because Mrs. Sykes received disability payments, lacks credibility. Petitioner stated that Mrs. Sykes received disability payments of about $494/month, i.e., about $5,928/year; however, he did not indicate for what years she received those amounts.

Petitioner's claim that he received $6,000 from International Paper for a work-related injury is suspicious because he had not previously made that claim.

Danney, Gary, and Ireland testified that they saw petitioner with a large amount of cash on several occasions in the early 1980's, but they did not testify about the amount of the cash hoard.

Petitioner admitted that he incorrectly told Fridley that the source of the cash seized from petitioners' house on March

19, 1998, was loans. He incorrectly certified to the Missouri Division of Family Services that he did not have property in a safe deposit box. He told Pierce that he had put about $25,000-$30,000 in the safe deposit box between January 1 and March 18, 1998. However, the last time petitioner entered the safe deposit box before March 18, 1998, was December 10, 1997.

    4.    Effect of the District Court Opinion in the Jeopardy Assessment Proceeding

The District Court found in the jeopardy assessment proceeding that petitioner had a cash hoard of $100,727.[6] However, the issue before the District Court was whether the jeopardy assessment was appropriate, not petitioner's liability for tax. See sec. 7429(b); Gaw v. Commissioner. T.C. Memo. 1995-373 (section 7429 review is a summary proceeding; the court does not decide the taxpayer's tax liability); Bean v. United States, 618 F. Supp. 652, 659 (N.D. Ga. 1985); Revis v. United States, 558 F. Supp. 1071, 1074 (D.R.I. 1983).

In deciding whether a taxpayer has offered credible evidence, we may consider another court's findings. However, absent application of res judicata or collateral estoppel, the findings of another court are not controlling because, in this

---

[6] The parties agree that respondent is not collaterally estopped by the District Court decision from disputing that petitioner had a cash hoard larger than $100,727. See Estate of Merchant v. Commissioner, T.C. Memo. 1990-160, affd. 947 F.2d 1390 (9th Cir. 1991).

Court, the presiding Judge "is the trier of the facts, the judge of the credibility of witnesses and of the weight of the evidence, and the drawer of appropriate inferences." Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; see Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-124 (1944).

The legislative history of section 7429 makes clear that a determination of the taxpayer's liability for tax is unrelated to the jeopardy assessment proceeding:

> A determination made under new section 7429 will have no effect upon the determination of the correct tax liability in a subsequent proceeding. The proceeding under the new provision is to be a separate proceeding which is unrelated, substantively and procedurally, to any subsequent proceeding to determine the correct tax liability, either by action for refund in a Federal District Court or the Court of Claims or by a proceeding in the Tax Court.

S. Rept. 94-938, at 365 (1976), 1976-3 C.B. (Vol. 3) 57, 403; see also Petzoldt v. Commissioner, 92 T.C. 661, 674-675 (1989).

5.  Conclusion

Petitioners introduced evidence relating to the amount of petitioner's cash hoard, but a substantial amount of that evidence was not credible. Section 7491(a)(1) refers to credible evidence relating to "any factual issue". We do not place the burden on respondent to prove one part of that issue and on petitioner to prove the rest. Thus, petitioners bear the burden of proving the amount of the cash hoard.

B.   The Amount of Petitioner's Cash Hoard

We find that petitioner saved $7,000 from 1966 to 1971.  For reasons discussed above at paragraph A-4, we believe that petitioner saved substantially less than the amounts he claimed from his International Paper wages, the sale of his personal possessions, and his buying and selling activity.  Thus, we find that he saved about one-fourth of his International Paper wages ($24,500), $2,000 from selling his personal possessions in 1985, and about one-fourth of his total adjusted gross income from 1989 to 1997 ($6,500) from his buying and selling activity.  Upon due consideration of the findings of the District Court, we conclude that petitioner had a cash hoard of $40,000 ($7,000 + $24,500 + $2,000 + $6,500) on December 31, 1996, and that petitioners had unreported taxable income of $109,200 in 1997 from petitioner's participation in the fencing operation.

C.   Whether Petitioners Are Liable for the Accuracy-Related Penalty

Respondent contends that petitioners are liable for the accuracy-related penalty for negligence and substantial understatement under section 6662(a) for 1997.

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment attributable to negligence or disregard of rules or regulations or to a substantial understatement of income tax.  See sec. 6662(a) and (b)(1) and (2).  Negligence includes failure to make a reasonable attempt to

comply with internal revenue laws or to exercise ordinary and reasonable care in preparing a tax return.  See sec. 6662(c). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1)(A).

Petitioners concede that they are liable for the section 6662 accuracy-related penalty if we find that they earned any of the $149,200 seized from petitioner's participation in a fencing operation in 1997.  Because we found that petitioners had unreported taxable income of $109,200 from petitioner's participation in the fencing operation in 1997, we hold that petitioners are liable for the section 6662 accuracy-related penalty for 1997.

To reflect the foregoing,

Decision will be entered
under Rule 155.